Matter of John A. v Bridget M. (2004 NY Slip Op 50992(U))

[*1]

Matter of John A. v Bridget M.

2004 NY Slip Op 50992(U)

Decided on June 28, 2004

Family Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 28, 2004

Family Court, New York County
In the Matter of a Proceeding under Article 6 of the Family Court Act John A., Petitioner,
 against
Bridget M., Respondent.
V- 01744-5/03

Arlene D. Goldberg, J.
A lengthy evidentiary hearing was held before this Court to determine which of the parties should have custody of their twin daughters, born out-of-wedlock on (d.o.b. redacted). The hearing spanned fourteen days.[FN1] Thirty two witnesses testified and fifty two exhibits were admitted in evidence. The Court, after conducting an exhaustive and painstaking review of the evidence, and upon careful and extensive deliberation on the issue, determined that the best interests of the children required that custody be awarded to the petitioner-father, as supported by the children's Law Guardian and by the independent forensic evaluator assigned by the Court, Dr. Stephen Bates Billick. The reasons for the Court's determination and the award of custody to the father were set forth in a written decision and order dated May 21, 2004. What follows is the expanded version of the decision which more fully details the trial evidence, the Court's findings and the law.[FN2]
New York, like most States, long ago abandoned the presumption of maternal superiority in custody cases, even as to disputes involving children of "tender years" See, Matter of Vincent v. Vincent, 47 A.D.2d 786, 365 N.Y.S.2d 289. Thus, the law favors neither mothers nor fathers, and gender has no role in a custody determination. See, e.g., Linda R. v. Richard E, 162 A.D.2d 48, 561 N.Y.S.2d 29 appeal after remand, 205 A.D.2d 498, 612 N.Y.S.2d 656 . Accordingly, the law provides that neither parent has a prima facie right to custody. See, DRL §70 (a).
The law also provides that an award of custody must be based solely on what is in the best interests of the child, and what will best promote the child's welfare and happiness. DRL §70(a). See also, Eschbach v. Eschbach, 56 N.Y.2d 167, 451 N.Y.S. 2d 658 (1982); [*2]Friederwitzer v. Friederwitzer, 55 N.Y.2d 89, 447 N.Y.S.2d 893 (1982). To make the determination, the Court must look to the totality of circumstances, including such factors as the age of the child, the quality of the home environment of each parent, the relative fitness of each parent, the ability of each parent to guide and provide for the child's intellectual and emotional development, and the financial abilities of each parent. Id. The court must also be mindful of the child's need for stability and of the length of time that the child has resided with a parent.
 It is clearly in a child's best interest to have a loving, wholesome and unobstructed relationship with both the custodial and the non-custodial parent. Thus, another important circumstance in the best interest analysis is the effect that an award of custody might have on the child's relationship with the other parent. See Bliss v. Ach, 56 N.Y.2d 995, 453 N.Y.S.2d 633. Accordingly, courts must consider which parent is able to "...place the child's needs before [the parent's] and to foster a continued relationship with the non-custodial parent." Lohmiller v. Lohmiller, 140 A.D.2d 497, 498,528 N.Y.S.2d 586,587. As such, courts must determine whether the custodial parent is willing to assure meaningful contact between the child and the other parent. See O'Connor v. O'Connor, 146 A.D.2d 909, 910, 536 N.Y.S.2d 903. Indeed, it is the duty of the custodial parent to see that such contact occurs and to do nothing that would compromise the other parent's relationship with the child. The duty includes protecting and nurturing the child's relationship with the other parent. See Daghir v. Daghir, 82 A.D.2d 191, 441 N.Y.S.2d 494, affd. 56 N.Y.2d 938, 453 N.Y.S.2d 609; J.F. v. L.F., 181 Misc.2d 722 , 694 N.Y.S.2d 592. This principle is of such importance that courts have concluded that a custodial parent's interference with the relationship between a child and a non-custodial parent is "an act so inconsistent with the best interests of the children as to, per se, raise a strong probability that the [offending party] is unfit to act as a custodial parent." See Entwistle v. Entwistle, 61 A.D.2d 380, 380-84, 402 N.Y.S.2d 213, 216 appeal dismissed by, 44 N.Y.2d 851; Maloney v. Maloney, 208 A.D.2d 603, 603-604, 617 N.Y.S.2d 190; Young v. Young, 212 A.D.2d 114, 628 N.Y.S.2d 957; see also Bliss v. Ach, 56 N.Y.2d 995, 453 N.Y.S.2d 633.
In this case, respondent-mother acquired de facto custody of the children when they were born and they have resided with respondent in New York City since that time. Respondent testified and also called numerous witnesses to establish that she is a devoted and loving mother. There was also proof that the children are doing well in school and that they are generally happy in their mother's care. However, there was also substantial and convincing evidence that respondent has tried to alienate the children from their father and to limit, control and ultimately terminate his access to them. Her efforts in that regard include making two false allegations that the father sexually abused the children while his interaction with them was being supervised by Court appointed social workers. The credible evidence further supports a finding that respondent either alone or together with her good friend Pam (also known as Pammy), coached the children to make the allegations that they did.
There was also abundant and credible evidence that the children made many negative statements about the father and aspects of his life during court ordered visitation and when the children were interviewed by psychiatrists and social workers during the pendency of the case. There was also convincing evidence that during those times, the children attributed many of their remarks and thoughts to things they had been told by their Mommy or by Pam. For example, Jewel Roberts, a social worker assigned to supervise visits between the father and the children, [*3]testified that one child stated, "We can't hug Daddy because Mommy said you are nasty and we can't hug you." The other child once said that "Pammy said I have to take a bath in my own bathtub because Daddy does bad things to us." Respondent's denial that she ever said anything negative to the children about their father was simply not credible. In fact, many aspects of respondent's testimony were not credible. In any event, respondent did admit to speaking to others in the house about the father and that the children may have overheard those conversations. Although respondent testified that she was committed to fostering visitation and a positive paternal/daughter relationship, her demeanor and tone indicated that she was not sincere in those assertions. In fact, it appears that respondent is either unwilling or unable to foster a positive relationship between the children and their father. The evidence indicates that respondent's efforts to deny petitioner access to the children and her hostility toward him stem from her unfulfilled expectation that petitioner would leave his wife and marry her.
BACKGROUND EVIDENCE AND PROCEDURAL HISTORY
Petitioner-father is a successful businessman and has four adult children ranging in age from 26 to 33 years old. Petitioner and his wife of thirty four years have their primary residence in Malibu, California. Petitioner also maintains a residence in St. Louis, Missouri, where he operates a business and an apartment in Manhattan that he utilizes for visitation with the twins.
 While visiting New York in 1997, petitioner met respondent, an actress and model. They started dating during the summer of 1998 and respondent became pregnant. In April of 1999, petitioner's wife learned about her husband's affair with the respondent and the pregnancy. Petitioner's wife testified that she thereafter filed for a divorce but continued to speak to the petitioner and spend time with him.
 On [d.o.b. redacted], respondent gave birth to identical twin girls in New York City. Although the petitioner's name was recorded on the birth certificates as the children's father, he declined to sign an acknowledgment of paternity and arranged for a DNA test which was performed shortly after the twins were born. After the test confirmed that petitioner was the children's father, he voluntarily paid support of $6,000.00 per month. He also came to New York on a fairly regular basis to be with the respondent and the children.[FN3] At the same time, and continuing at least through the trial in this matter, respondent also received significant financial support and expensive gifts from another man, with whom she had an ongoing romantic relationship since sometime during the fall of 1998.
Respondent and the other man became engaged during the course of the proceedings in this case. However, after she became pregnant, as well as after the children were born, respondent entertained the belief and the hope that the petitioner would divorce his wife and marry her. According to petitioner's testimony, the respondent brought up the subject of when they would get married hundreds of times but he avoided the discussions because he knew he did not want to marry her. However, petitioner conceded that he never directly told the respondent that marriage was not a possibility.
The Court finds petitioner's protestations that he did nothing to give the respondent cause to believe that he would leave his wife and build a life with respondent and the twins to be [*4]disingenuous based on the credible testimony of respondent's therapist, Ms. Ellen Shields.
Ms. Shield's testified that she started seeing the respondent in September of 2000 on a weekly to bi-weekly basis. She testified that the reasons that respondent had sought therapy was to cope with being a single mother of twins and her concerns about whether the children's father, whom she loved, would marry her. Sometime in October of 2000, Ms. Shields met the petitioner, who had come to a therapy session with the respondent. According to Ms. Shield's testimony, during that session, petitioner indicated that his plan was to divorce his wife, which he thought would take about a year, and have the respondent and the children move to St. Louis. However, petitioner never took any steps toward divorce. In fact, soon after the World Trade Center disaster in September 2001, the petitioner and his wife decided that they would remain married and petitioner's wife asked her attorney to withdraw her divorce action. Despite this turn of events, petitioner continued to come to New York to be with the twins and the respondent. Nevertheless, the testimony indicates that there was a marked deterioration in petitioner and respondent's relationship after petitioner failed to divorce his wife by the fall of 2001.
 The parties ended their relationship in approximately September of 2002 when the children were three years old. Not surprisingly, the parties have different recollections as to who ended the relationship and why.
On September 30, 2002, petitioner commenced an action for an order of filiation. Despite the fact that the respondent had been accepting $6,000.00 monthly in support from the petitioner for both children since 1998, and that the parties had held the petitioner out as the father of the children since the time of their birth, respondent would not consent to the entry of orders of filiation and requested a genetic marker test. Respondent testified that she did this because the first test that was administered shortly after the children were born "didn't seem official." She also indicated that the initial test was done before she was certain the twins were identical. Because only one of the girls was tested, respondent allegedly believed that the twins might have different fathers. Respondent's request for the DNA test had the effect of leaving the petitioner without any legal right to see the children pending the test results. After the test confirmed that respondent is the father of both children, petitioner filed a petition seeking visitation. The respondent requested that the Court only order supervised visitation because she alleged that the father acted inappropriately with the children in both a sexual and "roughhousing manner." Supervised visitation was ordered pending investigation.
 Ms. Linda Ehrenfreund, a certified social worker, who was subsequently qualified at trial as an expert in child custody, supervised the first three visits between the twins and petitioner which took place on March 29, April 19 and April 20, 2003. The evidence shows that respondent was unhappy with her supervision from the very first day. Respondent-mother accused Ms. Ehrenfreund of being neglectful because one of the girls had sustained a scratch on her hand. However, Ms.Ehrenfreund testified credibly that the child had pointed out the scratch to her at the start of the visit. Ms. Ehrenfreund also testified that shortly after meeting the twins for the first visit and before they had even left the mother's home, one of the children stated that she didn't like her Daddy because he plays too rough with her. Ms. Ehrenfreund concluded that the child's unsolicited statement and the timing thereof suggested that the child had been coached to make the remark.
Ms. Ehrenfreund further recounted that respondent became very angry when she [*5]telephoned her and said that the children would be about five minutes late in coming home because they had stopped for ice cream. Respondent did nothing to hide her displeasure from the children when she appeared on the street at the end of the visit, grabbed the children's hands and walked away without giving them the chance to say goodbye to their father. Respondent subsequently moved this Court to replace Ms. Ehrenfreund as the supervisor based on these events and because she claimed Ms. Ehrenfreund was unable to run after the children. Respondent's request was denied on April 14, 2003.[FN4]
On the next scheduled visitation day, April 19, respondent provided Ms. Ehrenfreund with a letter from a medical doctor, dated April 5, 2003, which indicated that both girls had restrictive airway disease and that their activities needed to be restricted. Respondent showed Ms. Ehrenfreund how to use a nebulizer and directed that the twins be given a treatment that
afternoon. Ms. Ehrenfreund testified that during the visit, they went to the petitioner's apartment where Ms. Ehrenfreund administered the nebulizer treatment to one of the children. It is uncontested that while inside the apartment, the petitioner took the other child to the bathroom. However, Ms. Ehrenfreund testified that she did not see the father do that. Petitioner maintained throughout these proceedings that he had no inappropriate contact with either child in the bathroom or anywhere else.
 On the following day, during petitioner's scheduled visitation time, respondent and her friend Pam took the children to the doctor because respondent alleged that they were ill. Ms. Ehrenfreund and the father met the mother, Pam and the twins at the doctor's office, where the doctor indicated that one child had a fever and somewhat labored breathing. During the time they were at the doctor's office, respondent confronted Ms. Ehrenfreund about having allowed the petitioner to take the child to the bathroom alone on the April 19 visitation even though she had asked Ms. Ehrenfreund not to allow him to do so. When Ms. Ehrenfreund responded that she didn't think the father had taken the child to the bathroom at all, respondent reiterated that the child had told her about it. Ms. Ehrenfreund then acknowledged that it could have happened whereupon Pam said, "[w]ell, I think that's neglectful and I think that's a reason for calling the child protective services." Ms. Ehrenfreund left the doctor's office and went with the children and the petitioner to his apartment where the children played energetically and the father read to them.
 Respondent testified that after returning home from the visit on April 20, one child said that the father had touched her "peepee."[FN5] Respondent testified that she then called her attorney to request a new supervisor. According to respondent's testimony, a day or two later the other child indicated that the father had done the same thing to her. After learning of these allegations, the Court granted the respondent's request that another supervisor be assigned.
On May 18, 2003, forensic social worker Jewel Roberts started supervising the
[*6]
visits.[FN6] According to respondent, the children reported that Ms. Roberts was absent during periods of the visits, which prompted respondent to hire a private investigator to conduct surveillance of the July 12, 2003 visit. Respondent raised another allegation of sexual abuse after the visit that occurred on July 12, 2003. Respondent-mother claimed that the father took one of the girls into a public bathroom in an amusement park located within Central Park and touched her vagina while the petitioner's wife stood outside holding the other child's hand. The mother testified that both children reported these events late the next day. The following day, July 14, 2003, respondent and her friend Pam took the children back to Central Park and videotaped them to determine if they knew where the bathroom was. The videotape was not entered into evidence and there was no specific testimony as to whether either child was able to identify the alleged bathroom. Although only one child was allegedly inappropriately touched, the respondent and Pam took both girls to Cornell Hospital on July 15, 2003, where they were both subjected to medical examinations and diagnosed with vaginitis.
 Based on the July 12, 2003 sex abuse allegation, the mother subsequently moved to suspend all visitation between the father and the twins and petitioner moved to amend his request for visitation to a request for custody. The court did not suspend visitation, but imposed additional safeguards. The Court granted petitioner's application to amend his petition and trial of the instant matter commenced on November 3, 2003 with the testimony of Dr. Stephen Bates Billick.
THE FORENSIC EVALUATION AND OTHER EXPERT TESTIMONY
 Dr. Billick was assigned by the court as the neutral forensic evaluator with the consent of the parties' attorneys [FN7] and the children's Law Guardian. Dr. Billick, an experienced psychiatrist, completed a comprehensive and detailed forensic report in this case which was admitted into evidence. He also testified extensively at the trial and was qualified as an expert in forensic and child psychiatry and child sexual abuse.
The Court finds that Dr. Billick gave credible testimony and rejects respondent's claim that he was in any way prejudiced against her or biased in favor of the father. Neither the events in Dr. Billick's own life or anything else raised by respondent would support such a belief. Dr. Billick consistently indicated that his sole concern in the case was determining what was in the children's best interest.
The testimony of respondent's expert witness, Dr. William Kaplan, who was called to rebut Dr. Billick's report and recommendations, falls far short of establishing adequate grounds for rejecting the findings made by Dr. Billick. Additionally, Dr. Kaplan never interviewed either child or the father and specifically said that he had made no inquiry of the mother regarding the sex abuse allegations.
[*7] Based on a variety of specified factors, including his interviews, observations, and evaluations of the children and of the parents, Dr. Billick concluded that the sex abuse allegations were untrue and that the children had been coached to make false statements about their father. According to Dr. Billick's testimony, only respondent and/or Pam would have told the children that their father had abused them. Dr. Billick provided cogent and powerful reasons for his conclusions and a sound analysis of the basis for his findings. Furthermore, his conclusions are supported by other evidence in the case.
Dr. Billick further concluded that the sex abuse allegations by the mother were either maliciously made to interfere with the paternal visitation, which would mean respondent has a character disorder, or that the allegations resulted from respondent being delusional. According to Dr. Billick, both conditions are difficult to treat. Dr. Billick also explained that if the allegations were the product of malicious intent, it was unlikely that the respondent could stop her malicious behavior. Dr. Billick further testified that regardless of the etiology of the allegations, children staying in the home of a parent who is malicious or delusional "constitute[s] a bad idea for raising children."
Dr. Billick also found that respondent displayed unhealthy narcissism which prevented her from putting her children's needs above her own. Notably, respondent's therapist, Ms. Ellen Shields testified that the respondent had both good and bad narcissism. Psychiatrist William
Kaplan was able to discern that respondent exhibited narcissistic traits based on a single 2 1/2 hour interview of respondent.
 Dr. Billick made other important observations about the respondent. One of the more noteworthy is that, "[i]t is impossible for her to see any positive aspect of father's parenting ability or the children's needs to have contact with him." (See, report, at 34.) He also found that the mother, "has consistently encouraged the children to have a negative view of father and also of stepmother." Id.
Dr Billick additionally indicated that the respondent alleged that the children only have difficulty with their breathing when there is a paternal visitation. Dr. Billick concluded that the mother was agitating the children about the visitation which in turn caused the children stress that produced the breathing problems.
 Significantly, and particularly relevant to the issue of custody is Dr. Billick's finding that
respondent actively attempts to alienate the children from their father. He additionally concluded that the mother was unable to separate her negative feelings toward the father from her obligation to encourage the children to have a relationship with him. According to Dr. Billick, this alone disqualifies the mother from being the custodial parent. As recognized by Dr. Billick,

"[t]he role of the custodial parent is to insure the health and welfare of the children in their growth and development. This includes promoting and encouraging a relationship that is positive with the non-custodial parent. It is obvious in this case that only one parent has this ability and desire, the father." (See Report at 34.)
Dr. Billick acknowledged that aside from her inability to foster a positive relationship between the father and the children, the respondent was, in psychiatric custody parlance, a "good enough mother," which Dr. Billick explained essentially means that the mother is able to meet the day-to-day needs of the children.
[*8]
Dr. Billick did not proffer anything short of a custody change as being adequate to ensure the emotional well-being of the children and to prevent irreparable damage to the father's ability to form a long-lasting positive and wholesome relationship with his twin daughters. In fact, at trial he took the position that the respondent's visitation and phone contact with the children should be supervised for a period of six months following the change in custody to ensure that respondent was not making any attempts to negatively influence the children's feelings about
their father.[FN8]
Although Dr. Billick recognized and was sensitive to the fact that the change in custody would cause significant stress and emotional turmoil in the children, he stated that any trauma caused by the event could be adequately addressed through therapy. He additionally stated that the long term benefits of the change in custody outweighed the potential harm to the children.The court also heard credible and convincing expert testimony from Lisa Lubell, a certified social worker with a specialty in child sex abuse, who was called as a witness by the children's Law Guardian. Ms. Lubell concluded, for a variety of reasons, that the children had not been sexually abused and that their statements about their father were the product of coaching. Her analysis and assessment of the issue were well reasoned and were based on extensive investigation. Ms. Lubell also articulated important concerns that the mother would not facilitate
a relationship between the children and their father and that she had exercised poor parental judgement by negatively influencing the children.
Ms. Julie Dowling was another certified social worker expert witness called by the children's Law Guardian. The Court found Ms. Dowling's testimony to be completely credible and forthright. Based on her extensive investigation and interviews and observations of the children, the parents and collateral sources, Ms. Dowling concluded that respondent-mother, despite her claims to the contrary, cannot encourage a positive relationship between the children and their father. Ms. Dowling also expressed the view that the children's emotional development has been harmed regarding their relationship with their father due to the negative environment that exists in the mother's home concerning the father. Ms. Dowling additionally testified that respondent indicated that she would always believe that petitioner had abused the children.
Both Ms. Lubell and Ms. Dowling, recommended, for stated reasons, that the father be awarded custody of the children. However, in contrast to Dr. Billick, they both recommended that the father's custody of the children be in New York and that the mother have liberal, unsupervised visitation with the children.
 The geographical component of Ms. Lubell and Ms. Dowling's recommendations was based on the strong attachment and affection the children had for their mother. Both witnesses expressed concern over the emotional upheaval that the children may experience as a result of a change in custody. During the course of her testimony, Ms. Lubell explained why she was recommending that petitioner have custody in New York as opposed to California where petitioner resides. Ms. Lubell's testimony on the issue provided an insightful and telling account
[*9]
of the dilemma. She stated as follows:

"... I am concerned about the effect that moving completely out of this environment, separating at such a long geographical distance for a fairly long period of time for children of this age would do if they were to move out of this state. However, that being said, I am very concerned about the psychological damage caused by children holding on to false beliefs about their father, and articulating these beliefs, and apparently developing some confusion about reality and fantasy. As a result, there is the possibility of long-term damage as a result of what has gone on in the environment with their mother. Based on our observations the environment with their father would be healthy and positive in many, many ways and not harmful except for the area of separation from their mother which is a big concern. Children need two parents to define and integrate into their psyche so they can grow up happy and healthy as full individuals. Neither one should be pulled away, neither one should become a source of conflict and anxiety. I feel that the best way this can be maintained for these children is by them to have ongoing contact with their mother, so that the attachment continues, yet custody with their father so that any continuing suspicions about their father and concerns about his parenting can be diminished by the amount of time spent with the father."
According to Social Worker Lubell, if the mother were to remain the custodial parent she would be unable to foster a relationship between the twins and their father because

"she believes that the father has done something to harm these children and that something has been of a sexual nature. She developed this belief over a long period of time, starting with suspicions and smaller allegations over years snowballing into an actual touching allegation."
Ms. Lubell additionally testified that the mother

"is really vested in continuing to be extremely suspicious and hostile and just that in itself will influence the children's relationship with their father. The children are very impressionable. Their emotional connection to their mother means that they pick up her feelings and her attitudes. So, even if not directly coached they can pick up quite a bit living in her custody that regarding her attitude towards their father."
Most significantly, Ms. Lubell further testified that granting the father liberal visitation would not suffice to ensure that no harm would be done to the children's relationship with their father and their psychological being.
Ms. Lubell, also testified that she agreed with Dr. Billick's assessment that respondent, aside from her inability to foster the children's relationship with petitioner, was "a good enough mother."
RESPONDENT MOTHER'S EXPERTS
[*10]
The mother's experts by their own admission did not have complete information upon which to base their conclusions. None of them did a forensic evaluation of the mother, father or either of the children. As such, these witnesses views on the custody and related issues are of little probative value and are consequently given little weight.
Dr. Celia Blumenthal was one of the mother's expert witnesses. Dr. Blumenthal was qualified as an expert in the field of child/adult psychiatry and in evaluating children suffering from child abuse. She was the only mental health professional who had directly observed the children to express the view that the children had not been coached. However, Dr. Blumenthal's testimony was equivocal.
According to Dr. Blumenthal, the respondent met with her on June 24, 2003 to arrange "play therapy" sessions for the children which commenced on July 3, 2003. Dr. Blumenthal stated that one of respondent's expressed concerns was that the father had been molesting the children. Respondent, however, testified that she did not take the children to Dr. Blumenthal for that purpose but to address the fact that the children were calling their father names during phone calls and saying mean things to him.
Dr. Blumenthal testified that during the first play therapy session both children were anxious. She further testified that one child made an unsolicited statement that her father had touched her "peepee." Dr. Blumenthal stated that the child's quick revelation caused her some concern that the child may have been coached. However, Dr. Blumenthal dismissed that notion assuming that the child believed that she had been brought to the office to speak about the abuse The other child only spoke about her father calling her names and choking and hitting her.
The next play therapy session was on July 17, 2003, four days after the alleged sex abuse incident in the bathroom in the amusement park. The mother came to Dr. Blumenthal's office on that day with Pam, the children and a video camera. The mother asked Dr. Blumenthal to videotape the session because she wanted to have proof that the children actually said these things which noone seemed to believe. The respondent set up the camera in Dr. Blumenthal's office. According to Dr. Blumenthal's testimony, during the session, one child talked about an episode in an amusement park where she said she had been molested. The child also played with dinosaurs which Dr. Blumenthal concluded was "indicative of having a large degree of trauma or some kind of anxiety." The other child did not claim to be molested, but continued to express that she was physically afraid of her father.
Dr. Blumenthal thought that it was unlikely that either child had been coached on July 3 or July 17. She also indicated that it was unlikely that the mother had made up the allegations although Dr. Blumenthal gave no reasons why she came to that conclusion.
 Dr. Blumenthal saw the children for three more play therapy sessions on August 4, September 4, and October 3. According to Dr. Blumenthal, the August 4, 2003 session was also videotaped at the mother's request. At this session, the twins were even more anxious and the child who said she had been molested at the previous sessions refused to be alone in the room without her twin sister. Dr. Blumenthal testified that the children's play on that date indicated that they loved their Daddy and wanted their parents to be together again. As to the September 4, 2003 play therapy session, Dr. Blumenthal stated that one child told her that her twin sister was worried that Daddy was going to take them away from Mommy. No details were provided about the balance of the play therapy sessions, nor were any of the videotapes of the play therapy [*11]introduced into evidence.
Dr. Blumenthal testified that based on the five sessions of play therapy she had with the children, it seemed likely to her that the child who spoke of the sexual molestation had been inappropriately touched. However, during cross examination, she indicated that it was merely a possibility. Dr. Blumenthal indicated that she had no opinion on whether the other twin had been molested because that child did not talk about it at all with her. She only spoke about being choked.
Although Dr. Blumenthal did not do a forensic examination, she repeatedly expressed the view that it did not appear that the children had been coached. However, even Dr. Blumenthal, conceded the possibility that the statements that the children made to her about their father may have been coached. In fact, she testified that the anxiety the children displayed and the manner in which one twin had almost immediately told her about being molested, were consistent with coaching. Dr. Blumenthal also conceded that she had asked some leading questions during the play therapy sessions. Furthermore, Dr. Blumenthal testified that she was not saying for certain that either child had been sexually abused. Dr. Blumenthal repeatedly stated that it was not her job to determine if the allegations were true because she had not been engaged to do a forensic evaluation. Another significant fact is that aside from their statements, Dr. Blumenthal testified that the only symptom of sexual abuse the children had was that they were very anxious. However, as discussed earlier, we know from Dr. Blumenthal's testimony that being anxious is also consistent with coaching.
 Dr. Blumenthal also indicated that the children were frightened of their father. However, she conceded that they did not appear frightened of him in the July 12 visit surveillance video (Petitioner's 6 in evidence). She also stated that she did not have to personally see the children with their father before concluding that they were afraid of him because she was not doing a forensic evaluation.
Dr. Mary Lynn Huffman, another expert witness called by the mother, was flown in from Georgia to testify at the trial. Dr. Huffman is a child memory specialist. She sought through her testimony to validate the methodology and integrity of the taped play therapy sessions the children had with Dr. Blumenthal, which Dr. Billick and Ms. Lubell had criticized. In contrast to their assessment, Dr. Huffman found few flaws in the manner in which the play therapy was conducted. However, she did concede that Dr. Blumenthal had used some leading and suggestive questions. She further conceded that she could not rule out the possibility that the statements that the children made during the play therapy were the product of coaching rather than actual memory. Notably, the respondent never offered the taped play therapy sessions that Dr. Huffman reviewed into evidence.
The testimony of Dr. William Kaplan, another of the mother's expert witnesses, also casts doubt on the validity of the allegations, since he conceded that it was unlikely that the father would have sexually abused the children on two supervised visits. 
OTHER TESTIMONY
The validity of the sex abuse charges is further undermined by other evidence in the case. According to the Administration for Children's Services (hereinafter ACS) child protective specialist, she received the complaint about the first sex abuse allegation on April 27, 2003. The child protective specialist recounted that Pam had reported that "the children during a supervised [*12]visit with their father had been sexually touched by their father." Notably, ACS ultimately determined that the report was unfounded. The investigation included interviews of the children on two separate dates. At the initial interview on April 29, 2003, one twin told the child protective specialist that "Pammy told me daddy touched my peepee." The other child, however, made no mention of being touched. The children's statements on the second interview were mostly related to the court case, which left the child protective specialist with the impression that the children had been coached.
It does not appear that ACS did any investigation of the July 12, 2003 abuse incident. However, Police Detective Collins, conducted an investigation into both the April and July sex abuse incidents. According to the testimony of Detective Collins, the case remains open and if closed would not be marked unfounded because the children had said the same thing to her on two occasions. Nevertheless, Detective Collins' testimony indicates that as recently as September 2003, she felt that the allegations were farfetched. Detective Collins, further admitted that the basis for the investigation was the report made by Pam and that she did not believe Pam and thought that Pam was slightly crazy. As to the statements of the children, the Detective testified that only one child had claimed that the father had touched her peepee, while the other child said that the father had choked her. The initial disclosure to Detective Collins occurred when the mother brought the children to the Detective's office. On that occasion, the child volunteered the statement about being touched which the Detective thought was strange because "it was like she knew why she was there and she had to get it out." On the second interview, which occurred in the father's New York apartment, the Detective testified that she tried to get the children to say that somebody had told them to say it, but the child, who had claimed the father had touched her had said,"Pam didn't tell me what to say. She just told me to tell you what happened." According to the Detective, the other twin, who mostly giggled on the first interview, stated at the second interview that her father had choked her.
As evidence that the allegations against the father may be true or that she had a good faith basis for saying the abuse had occurred, the respondent points to the fact that Jewel Roberts, who supervised most of the visits, and who was qualified as an expert in child sex abuse, testified that she could not say whether or not the children had been sexually abused. However, Ms. Roberts explained that she was not comfortable giving an opinion on that subject since she had not evaluated the children in that way. Furthermore, Ms. Roberts testified, based on her observations during the supervised visits, that the father always acted appropriately with the children and that they were happy and comfortable when they were with him. Indeed, the other certified social workers who supervised visits gave similar testimony.
Petitioner-father gave strong and convincing testimony that he never sexually abused either child and never engaged in any sexualized behavior with them. The father and his wife also gave credible testimony that neither one of them took either child to the bathroom while at the amusement park on July 12. The investigator that the mother had hired to do surveillance of the July 12 visit also testified that he never saw the father take either child to the bathroom. In fact, his testimony established that each time he looked into the amusement park, the father was taking the children on and off the rides and that the children looked happy.
The surveillance tape of the July 12 visit made by the investigator is also a significant piece of evidence because it clearly shows how happy and at ease the twins were with the [*13]petitioner and his wife. Especially noteworthy is the fact that after the time that the respondent contends that one twin was molested by her father in the park bathroom, the child and her twin sister are seen skipping along their father's side and smiling.
Jewel Roberts, the certified social worker who supervised the July 12 stated that she never saw the father take either child to the bathroom. She further gave credible testimony that later that day, while giving the children a bubble bath in the father's apartment, she asked them if they had gone to the bathroom in the amusement park and that the children said they had not. Jewel Roberts also credibly testified that she had a practice of asking the children at the end of each visit if anything had occurred that they did not like. Neither child made any complaints on any of the visits.
Jewel Roberts' credible testimony concerning one of the children's attire on June 14, 2003, further undermines the respondent's claim that she had a good faith basis for making the sex abuse allegations. Ms. Roberts discovered that the child had no panties on during the visit when she removed the child's clothes that had been soaked in a rainstorm. Ms. Roberts questioned the respondent about it in light of the nature of the allegations against the father. The respondent said that she didn't know the child wasn't wearing panties. According to Ms. Roberts' testimony, the respondent asked the child about it but the child did not give an answer. Ms. Roberts testified that the respondent also said that she had laid out the child's clothes and had dressed the child. However, during the segment of respondent's testimony relating to the child not wearing panties, the respondent stated, "the children dress themselves. Actually they pick out their underwear from the bureau drawer every morning and dress themselves." (T 12/5/03 at 7). At another point in the trial, however, the respondent, when asked to describe what she does to take care of the children, stated, "I pick out their clothing for the day with them...I help them get dressed..." (T 12/5/03 at 48.) The respondent attributed the lack of panties to being an oversight - the result of her being distracted on that day. One of the causes of the distraction she cited was Dr. Billick's surprise visit. However, her testimony shows that he did not arrive until 12:20 p.m. By that time, the children would have already been dressed since respondent testified that they had gone to the pediatrician in the morning. Furthermore, given the high level of attention the mother devoted to every aspect of the supervised visits and to her children, it is difficult to accept that she would ever become distracted about anything on scheduled visitation days. It is further difficult to fathom how a mother who truly believes that a father is a child molester and had touched their child's vagina on a previous date would not check and double check that the child had underwear on when the errant father was scheduled to see the child again. The failure to make sure that the child was properly attired suggests that the absence of the underwear on the June 14 visitation day was purposeful or that the mother actually had no real concerns about the father's behavior because she knew that the sex abuse allegations were fabricated.
The testimony of the petitioner's four adult children and his wife provide an additional basis for concluding that the sex abuse claims are invalid. All of them testified that the petitioner never did anything of a sexual nature with his daughter, three sons or any of his grandchildren.
They also said that they had no reservation about allowing the petitioner to care for the grandchildren, which includes several granddaughters of comparable age to the twins, as he always acted appropriately with them. The petitioner's wife and children all believed that the sex abuse charges were ludicrous. They were all also supportive of the petitioner's request for [*14]custody and were eager to welcome the twins into the family. The lack of any prior history of child sex abuse by the petitioner was confirmed by the evaluations done by both Dr. Billick and Ms. Lubell.
The time frames and circumstances when the allegations of misconduct and sexual abuse by the father occurred also support the conclusion that the claims that petitioner molested the children were maliciously made. In this regard, the testimony of respondent's therapist, Ms. Shields, is very enlightening.
Ms. Shield's testimony establishes that respondent continued to feel anger toward petitioner even after the parties' relationship ended. In fact, some of the stated therapy goals were to lessen the respondent's anger and her sadness. Another therapy goal that Ms. Shields acknowledged was to help the respondent resolve the custody case in the respondent's favor. According to Ms. Shields, the respondent had expressed fear that the petitioner would take the children away from her as early as March 2001. The date is significant because Ms. Shields's testimony establishes that it was not until the children were about 1 ½ to 2 years old (which would correspond with the period from about March 2001 to September 2001) that respondent ever raised any concerns of a sexual nature regarding the petitioner and the twins. Specifically, during that time, respondent told her therapist that she was concerned that one twin may have been sexually molested because she had seen the child playing with a doll and looking at the doll's genital area. Respondent also told Ms. Shields that the petitioner had made a remark about the beauty of the children's genitalia during a diaper change. However, respondent offered inconsistent testimony as to when the comment was made, and petitioner testified that it was actually the respondent who had made the remark. The only other revelation respondent made to her therapist regarding sexualized conduct by petitioner toward the twins did not occur until after April and July of 2003 when respondent told Ms. Shields about the sex abuse allegations that are at issue in this matter. This is noteworthy because respondent testified at the trial that she had noticed specific inappropriate conduct by the petitioner involving the twins as early as the spring of 2000 which upset and concerned her. According to respondent's testimony, that conduct was one of the reasons she started to see her therapist, "I was upset over what I was beginning to process as inappropriate behavior." In fact, respondent claimed that she was trying to get the petitioner into therapy with her "because I thought maybe I could help him change." Yet, Ms. Shields's testimony establishes that of the behaviors that respondent says concerned her in 2000, respondent only mentioned the genitalia comment to her, and notably did not do so until at least six months after respondent's therapy began. Ms. Shields's testimony also established that concern about sexualized behavior by the petitioner with the children was not identified as being one of the reasons the respondent was seeking therapy.
 Additional testimony by Ms. Shields provides further proof that respondent's claims are not credible as it establishes that prior to March 2001, the only concerns that the respondent ever expressed to the therapist about petitioner and the children related solely to his taking physical risks with them, i.e., pushing the twins too high on the swings, rollerblading with them, shaking them, and allowing them to play on large rocks in Central Park. During her own testimony, in recounting petitioner's alleged reckless behavior, respondent added her complaints that the petitioner threw the children up to the ceiling and swung them upside down like a pendulum. Ms. Shields testified that she had no concerns about the children's safety because respondent had told [*15]her that someone was always there when the petitioner would be with the children. However, the alleged presence of a second person does not appear to have been induced so much by respondent's fears over the physical risks that the petitioner allegedly took, but because, as the credible evidence indicates, respondent believed that a separate person was required to watch each child.
At this point, the petitioner's account of the respondent's objections to his interaction with the children should be mentioned. As an initial matter, the court finds that the petitioner's testimony, in contrast to the respondent, was consistent and non-evasive, and in important respects was supported by other evidence in the case. In short, he was the more credible witness. Essentially, the petitioner described how much he loved to be with the twins, to get on the floor and play with them, and to read to them. He testified that the respondent would always complain that they were making too much noise or that he was paying too much attention to the twins and not enough attention to her. The testimony of respondent's therapist supports this claim as she conceded that she had noted that the birth of the twins had taken the focus off of the respondent. Petitioner also stated that he was often alone with the children when he would take them to the park and on walks in their strollers because the respondent refused to go with them. Petitioner denied being careless or distracted when he cared for the children. He further disputed respondent's claim that one of the children had gotten a large egg on her head when she bumped it due to the petitioner not watching the child on her christening day. The testimony of the child's godmother, who was present at the christening, supports the petitioner's claims. Notably, the godmother noticed nothing unusual and indicated that respondent never mentioned anything happening to the child on the day of the christening. Additionally telling is the contents of the August 19, 2000 letter that respondent wrote to petitioner (Respondent's 18 in evidence), in which she makes no complaints about the petitioner's parenting. In fact, in that letter, respondent compliments the petitioner and his parenting skills. According to petitioner, respondent never complained to him about sexualized behavior with the children. He maintained that the only complaint she made was that he was too rough with them. However, petitioner, who had thirty years of child rearing experience told respondent that he handled the children the same way he had handled his other children.
Respondent's testimony was clearly geared toward trying to create the impression that her concerns that petitioner was engaging in inappropriate sexualized behavior with the twins developed long before she would have had any motive to fabricate such charges. However, her testimony on that point was not credible. In fact, the whole tenor of her testimony is indicative of a somewhat sophisticated plan to build a case against the petitioner in the event he was to try and obtain custody, as she feared he might do since March 11, 2001.
 The testimony of respondent's fiancé is indicative of this point. He testified credibly that respondent did not raise any concerns with him about the father's roughhousing and inappropriate behavior until just after September 11, 2001, which corresponds with the time frame when petitioner had not only failed to do anything about divorcing his wife but had reconciled with her. The fiancé asked respondent if she wanted him to talk to the father about her concerns but she declined. At that time, respondent also told her fiancé that a scratch she had on her arm was actually caused by the petitioner. This contradicted what respondent had told him in the past about the source of the scratch.
[*16]
On October 4, 2001, respondent met with clinical psychologist, Dr. April Kuchuk. According to Dr. Kuchuk's credible testimony, the respondent's attorney [FN9] had made the referral. Respondent told Dr. Kuchuk that she had concerns over the children's physical safety and that they might be at risk for being sexually abused. Respondent recounted the nature of her concerns, which included the claim that petitioner had commented about the children's vaginas. Respondent also told Dr. Kuchuk that she saw one child have interaction with a doll. However, this time, in contrast to what respondent had told her therapist, respondent indicated that the child had put her mouth on the genital area of the doll and mumbled something that respondent thought was possibly sexual in nature. Dr. Kuchuk advised respondent that the behavior she described by the children was age appropriate and that the father's conduct did not rise to the level of sex abuse.
According to Dr. Kuchuk, respondent discussed wanting to keep the children away from their father. Yet, the parties' relationship and respondent's hope that petitioner would marry her continued for approximately another year. These facts certainly suggest that respondent's disclosures to Dr. Kuchuk were not motivated by any real concern about the petitioner's behavior but toward developing a potential litigation strategy. Indeed, Dr. Kuchuk considered the possibility that the respondent may have been trying to build a case against the father. However, she also thought that the respondent might just be an anxious and concerned parent. Dr. Kuchuk testified that she suggested meeting with the respondent and petitioner to discuss the parenting issues. However, no meeting ever took place. In fact, Dr. Kuchuk testified that the next time she heard from the respondent was about one year later, which would be after the parties' relationship ended, when the respondent called to schedule another consultation. However, Dr. Kuchuk did not have any available time.
Another important aspect of the evidence that also casts doubt on the validity of respondent's claims concern her good friend Pam. It is undisputed that Pam functioned as a part-time nanny for the twins since they were about one year old. It was also undisputed that Pam disliked the petitioner-father and was extremely hostile toward him. Petitioner gave un-controverted, credible testimony that when the parties' relationship ended, Pam threatened "to come up with all kinds of allegations" against him. This is significant since the mother testified that the initial disclosure about the sex abuse was made to Pam by one of the children and that Pam was the one to report the April 2003 sex abuse allegations against the father to the Administration for Children's Services. Respondent testified that she subsequently learned from Pam that Pam had called in a report about the abuse of the children to the Administration of Children Services. The mother's assertion that Pam had made the report to ACS without her knowledge was simply not convincing. Pam as previously discussed was also involved in other important aspects of the case. Furthermore, we know from Jewel Roberts' testimony that Pam was scheduled to stay with the twins on July 11, 2003, the night before the second sexual abuse incident allegedly occurred.
 Yet, curiously, the respondent-mother did not call Pam as a witness at the trial, claiming [*17]that Pam was not in town much anymore and had told respondent that she "doesn't want anything more to do with this situation." One is hard pressed to believe that Pam would abandon the respondent's cause when the father was making his bid to remove the children from respondent's custody if the allegations that were made against him had any validity. In short, respondent's explanation for Pam's absence was not credible.
Another pause for concern is respondent's confusing and admittedly vague description of the facts and circumstances surrounding the initial April disclosure of sex abuse by one of the children to Pam and then to respondent.
CONCLUSION
It is the Court's finding that the credible testimony does not establish that either child was sexually abused or that respondent had a good faith basis for saying that they were. What unfortunately emerges from the credible evidence is that respondent, due to her anger over petitioner's failure to divorce his wife and marry her, either alone or together with Pam, coached the children to make the allegations that they did. The evidence further shows that the charges were made to deny the father access to the children. Such acts are inconsistent with the duties of a custodial parent. It is axiomatic that a parent is not acting in the child's best interest when he or she deliberately frustrates or interferes with visitation or makes false sexual abuse allegations. See David K. v. Iris K., 276 A.D.2d 421, 714 N.Y.S.2d 297.
Interference with the parent-child relationship can take many forms, but a more subtle and insidious form of interference which has the potential for greater and more permanent damage to the emotional psyche of a young child is the psychological poisoning of a young person's mind by turning him or her away from the non-custodial parent. See e.g., Young v. Young, 212 A.D.2d 114, 628 N.Y.S.2d 957. Respondent's actions constitute that form of interference.
The respondent contends that even if the court found that the sex abuse charges were not bona fide, two instances of false allegations do not justify a change in custody. However, at least one court has found it sufficient. See, Matter of Karen B. v. Clyde M., 151 Misc 2d 794, affd. sub. nom. Karen PP v.Clyde QQ, 197 AD2d 753 (3d Dept 1993). In that case, which involved a four- year old child, the mother made two reports of sex abuse by the father. A five-month period separated the two reports. Additionally, the experts, who had interviewed the child, rendered conflicting opinions on the validity of the child's allegations. Here, the experts were unanimous that the allegations were not credible.
The Family Court in Karen B. concluded that "it is likely that the mother programmed her daughter to accuse the father of sexually abusing the child so that she could obtain sole custody and control or even preclude any contact that the father might have with his daughter." The evidence in this case supports a similar finding. The Court also expressed the belief that "any parent that would denigrate the other by casting the false aspersion of child sex abuse and involving the child as an instrument to achieve his or her selfish purpose is not fit to continue in the role of parent." Moreover, in this case we are not solely dealing with fabricated sex abuse charges but with allowing an atmosphere to prevail at home in which the father is denigrated. Furthermore, in this case there is substantial evidence that respondent is incapable of facilitating a positive relationship between the children and their father. There is also convincing evidence that respondent's actions were part of a plan that developed over the course of two years.
This Court is extremely mindful of the fact that the mother has been the custodial parent [*18]since the children were born and that the change in custody will be a stressful and traumatic experience for the children. However, the general rule that a court give preference to the initial custody arrangement, whether set by court order or by mutual agreement, is not absolute and is certainly not controlling when circumstances show that continuation of such custody arrangement would be adverse to the child's best interests. See e.g., Fanelli v. Fanelli, 215 A.D.2d 718, 627 N.Y.S.2d 425. Furthermore, that a change in custody may prove to be temporarily disruptive to the child is not determinative as all changes in custody are disruptive. See Matter of Nehra v. Uhlar, 43 N.Y.2d 242, 248, 401 N.Y.S.2d 168, 171; Vernon v. Vernon, 296 A.D.2d 186, 746 N.Y.S.2d 284. Moreover, as previously mentioned, according to Dr. Billick, the trauma of the event may be adequately addressed through therapy and the long term benefits of the change outweigh the potential harm.
The evidence in this case shows that the father is an experienced and caring parent, having four adult children, who unanimously gave him high marks as a father, as did petitioner's wife of thirty four years. All persons who have seen him interact with the twins testified that he is a very good parent and that the twins love him and are happy when they are with him. The testimony establishes that he can foster the relationship between the mother and the children whereas the mother cannot.
While petitioner has had extramarital affairs, his failings impact on his ability to be a good husband, not a proper custodial parent, irrespective of whether his wife continues with the marriage. In contrast, the mother's failings, her unbridled anger toward the father and inability to foster the paternal parental relationship, make her ill suited to be the custodial parent for the children. A mother who instills in a child the false belief that the child has been sexually abused by his/her father actually poses a danger to the mental and emotional welfare of that child. Such a parent is not fit to act as the custodial parent. The fact that the mother in this case has been in therapy for several years and that she still engages in such conduct underscores and enhances the danger to the children. To leave the children in her custody would expose them to further emotional damage and likely make a healthy and wholesome father/daughter relationship impossible.
In sum, as set forth in the decision and order of May 21, 2004, it is the Court's finding that it is in the best interests of the children that the Petitioner be awarded custody, as supported by the children's Law Guardian and the forensic evaluator. However, as the mother has had such a strong presence in the children's lives and given their attachment to her, the court finds that a permanent move to California at this time would prove to be detrimental as it would deny the mother meaningful and regular visitation with the children. Petitioner testified that he would be willing to move to New York to obtain custody. Therefore, the court finds that the father's custody should be conditioned, as advocated by the law guardian, to living within forty (40) miles of the New York metropolitan area where the mother resides. The Court further finds and ORDERS that the mother's visitation and telephone contact with the children be monitored and supervised pending any further order of the court. The Court further finds and ORDERS that the mother is not to permit Pam S. to have any contact with the children. It is further ORDERED that the physical exchange of the children shall not occur until June 1, 2004 at 12:00 p.m. so that the children may complete their school year unless the parties mutually agree to the exchange occurring on a different date. As of June 1, 2004, the father may take the children to [*19]California or anywhere else for summertime vacation for a consecutive four week period. The children shall then have supervised visitation time with the mother for a one-week period.
Counsel and the Law Guardian are to submit to the Court, proposed supervisors and additional visitation proposals. The mother is hereby ORDERED not to make any negative comments to the children about the father or this custody award.
It is so ordered
This constitutes the expanded decision of the Court.
Notify parties and the children's law guardian.E N T E R
Dated:June 28, 2004
New York, New York
____________________________________
 Arlene D. Goldberg
 J.F.C.

Footnotes

Footnote 1:The trial was conducted before me on the following dates: November 3, 5, 6, 7, 14, December 3, 4, 5, 8, 9, 10, 12, 15, 17, 2003.

Footnote 2: The entirety of the May 21, 2004 decision and order is herein incorporated by reference.

Footnote 3:Respondent states in the summation brief that the father did not see the twins for the first three months of their life. This is at odds with her trial testimony. 

Footnote 4:The Court has taken judicial notice of the prior proceedings and orders in the case.

Footnote 5:The Court notes that it is impossible to determine from the testimony whether the incidents of sexual abuse are alleged to have occurred in the course of the April 19 or April 20, 2003 visit.

Footnote 6:When Ms. Roberts was unavailable, forensic social worker Traci Shinabarger supervised the visits between the father and the twins. She accompanied Ms. Roberts to the June 14 visit to meet the parents and the children. Ms.Shinabarger supervised the visits by herself on June 15, September 13 and 14, October 11 and 12, 2003. 

Footnote 7:Respondent-mother subsequently changed counsel.

Footnote 8:There was no recommendation in Dr. Billick's written report completed pre-trial that the visitation with the mother be supervised. However, Dr. Billick testified that it was something he agonized over and upon further reflection believed would be necessary. 

Footnote 9:There was no pending litigation at the time of the referral. It is unknown to the court whether the attorney who made the referral was associated with the firm that initially represented respondent in this matter.