OPINION OF THE COURT
David F. Jung, J.
The petitioner/mother seeks sole custody of the parties’ only child to herself; that an order of protection issue in favor of petitioner against respondent; and that respondent be punished for violating the temporary order of protection issued by the court. The respondent/father petitions for sole custody; an order of protection and that the petitioner be punished for violating this court’s prior custody order. All six petitions were consolidated for trial.
*795 FINDINGS OF FACT
The subject child, Mandi M., was born September 7, 1986. Mandi’s parents, the petitioner and respondent herein, were never married, but an order of filiation was made by this court and paternity has never been an issue. The parties lived together in the home of respondent for one year before Mandi was born and continued together until August 15, 1990 when they separated.
By consent, the parties entered into a joint and split custodial arrangement on July 23, 1990. The parties had worked out a comprehensive arrangement whereby, and as part thereof, the father would have the child from Sunday at 1:00 p.m. until Wednesday at 7:00 p.m. The mother would then have the child from Wednesday at 7:00 p.m. until the following Sunday at 1:00 p.m. The agreement resulted in an order of this court dated July 23, 1990 and entered September 5, 1990. The parties abided by the terms of the agreement and order until September 1990 when the mother filed her petition to modify requesting that she "retain all custody and visitation to be supervised, if at all”. The mother alleged a change of circumstances in that: "Mandi had disclosed sexual advances and behavior problems because of concerns. Also it is not good for her physical, emotional and social well being to go back and forth between parents. Social Services is currently investigating.” As a result of her allegations and upon the recommendation of the Law Guardian, the court entered a temporary order requiring the father’s visitations with Mandi to be supervised.
According to the mother, in September 1990 Mandi disclosed to her certain sexual abuse perpetrated on Mandi by her father. He allegedly put his finger in her "peer”. When she said that it hurt, he told her that he could do what he wanted. She also claimed that her Daddy’s "dinkie” got bigger and "stuff came out”. The mother reported this to Jan Carter, a friend of hers, employed by Community Maternity Services, and on September 9, 1990 Jan Carter went to the home of Mandi and spoke to her. Jan Carter testified that Mandi told her that Daddy put his "peer” on her "peer”. She also told Ms. Carter that Daddy put his finger in her "peer” and that she told him to stop and it hurt and she cried. Ms. Carter placed a call to the New York State Central Register for Child Abuse and Maltreatment also known as "Hotline” and reported the incident.
Sally Conkling, a caseworker with the Fulton County De *796 partment of Social Services, conducted the investigation. She testified that the child told her that the respondent had put his finger in her vagina. Through a contractual arrangement between the Department of Social Services and the Family Counseling Center, Mandi was interviewed by Bette Malachowski to determine whether the allegation of sexual abuse could be validated. Ms. Malachowski saw Mandi on September 10, 13 and 14, 1990. The witness identified herself as a child sexual abuse therapist specializing in 2 ló-to-lS-year-old victims. She has a Master’s degree in psychology and a Bachelor’s degree in sociology, and in addition thereto has completed 150 hours of postgraduate work in her field. She testified that she has interviewed approximately 200 children concerning allegations of sexual abuse and has validated 75% of them and found the remainder to be fabricated.
The mother repeated all of the allegations to Ms. Malachowski and additionally stated that on September 9 Mandi had told her that the respondent has put his "peer” on her "peer” and that he had put his hand under the covers of the bed and touched her buns stating, "You know, like you take your temperature.”
The expert observed no outward signs of emotion when the mother spoke to her and also found that the mother seemed to be repeating the story by rote. When asked what the witness meant by the expression "rote”, she stated that the petitioner had to start from the beginning and repeat the whole story. She couldn’t respond to questions without starting from the beginning and completing the entire story.
At the first interview with the expert, Mandi could not identify the genital parts of the male and female nor could she distinguish between "secret touch” and "bad touch”. She said that her stepbrother, Matt, had hit her, but she had no episodes of other touching problems. At the second interview, Mandi could name the breasts as "boobies”, the vagina as a "peer” and the buttocks as "butt”. She stated to the expert that she had no touching troubles with her boobies, peer or butt. The witness observed no sexual play with the anatomically correct doll nor did Mandi ever use the word "dink” when describing the male penis. At the last interview the child again stated that she had no touching troubles and responded as follows to questions by the therapist:
"Therapist: Q. Mandi, did any kind of touching troubles happen with your pepe, boobies or your butt? Or, are you making believe?
*797 "Mandi: A. Making believe. He didn’t do it.
"Therapist: Q. He didn’t do it?
"Mandi: A. No.
"Therapist: Q. Who didn’t do it?
"Mandi: A. My father; I was just joking about it.
"Therapist: Q. You were just joking about it. So Daddy really didn’t do anything. You were only making believe about it?
"Mandi: A. Yes.
"Therapist: Q. How come you were only making believe about it?
"Mandi: A. I was joking.
"Therapist: Q. How come you were just joking about it?
"Mandi: A. I don’t know.
"Therapist: Q. Did anybody tell you to make a joke about it?
"Mandi: A. Yes.
"Therapist: Q. Who told you to make a joke about it?
"Mandi: A. I don’t know.
"Therapist: Q. You don’t know. Alright, I think then we are done talking, okay? Is there anything else you want to talk about?
"Mandi: A. No.”
In her report of September 18, 1990 received in evidence, Ms. Malachowski stated, "Petitioner, as the complainant in this case, has a vested interest in the outcome of the case. She would like to have full, instead of joint, custody of Mandi as well as no visitation rights to respondent, Mandi’s father. She has indicated that she wants this man out of her life. This is taken into serious consideration by this therapist.” The expert concluded that there was no information which would indicate that Mandi had been sexually abused by her father.
Lawrence Horowitz, D.O., the child’s pediatrician, testified that the mother brought Mandi to him for an examination on September 13, 1990. The doctor’s physical examination of the child revealed nothing and the child denied to him that anything had happened.
The Department of Social Services concluded that the allegations of sexual abuse were unfounded and so notified the parties.
In February 1991, the mother once again contacted the Department of Social Services claiming that Mandi revealed *798 to her additional sexual abuse that had occurred at the father’s home during visitation. When interviewed by Loren Dybas, a D.F.S. caseworker, on February 4, 1991 the child claimed that "secret touch made her uncomfortable”; that Mandi placed her hand on her Dad’s "dinkie” and she touched Dad’s "electric dinkie” to her Dad’s "dinkie”. She claimed that her underpants were on and her Dad’s clothes were off. During the same 45-minute interview, she stated that her panties were off when her Dad touched her with the "electric dinkie”. She told the interviewer that she didn’t want to see her Dad again. Ms. Dybas reported this interview through the "Hotline” on February 7, 1991.
M. Frank Sack, Ph.D. also appeared as an expert witness. Dr. Sack received his Master’s degree in psychology and his doctorate in behavioral science. He is a master expert polygraphist and admitted that he had never attempted a validation process with a young child although he had conducted thousands of interviews with and without a polygraph device to demonstrate veracity, and of those approximately 1,000 had to do with sexual abuse. Additionally, he had interviewed 12-15 children under the age of 12 years.
Dr. Sacks interviewed Mandi once on April 25, 1991. The expert testified that Mandi told him that she played "secret touch” with the respondent; that while playing, the respondent, her father, put her on a bed with her clothes off and touched her "peer” with his hands. She stated that Daddy told her not to tell anybody what had happened. The interviewer additionally stated that when Mandi told him to stop touching her, her father said, "FU do what I want”. Dr. Sack concluded that Mandi was sexually abused by her father. On cross-examination, Dr. Sack stated that he was familiar with the S.A.I.D.* Syndrome symptomized by a recent separation or divorce, hostility between the separating parents, and disclosure by the child of sex abuse to one parent. The expert was aware that many false allegations have been made and they are most common when the above factors are present.
Nori Shannon, the preschool teacher of Mandi, testified that Mandi was happy in her father’s company and that she observed no fear between the child and the father during her observations of them from July through October 1990.
Neither the probation officer nor the certified social worker *799 in the mental health clinic observed any fear of the father by the child.
DECISION AND ORDER
In applying the law to the facts of the case before it, the court has considered all of testimony and exhibits adduced at the hearing together with a lengthy Law Guardian’s report which recommends that full custody of Mandi be placed with her father and that the mother have liberal visitation privileges.
The court is faced with a dilemma that often confronts a jury or Judge, i.e., experts have rendered diametrically opposed opinions. The consequences of this court’s decision to Mandi are potentially enormous. If she is placed with her mother, and the father limited or excluded from having contact with her, when in fact he has done her no harm, then a tremendous injustice results. If custody is placed with the father, and he has sexually abused her, an equal injustice with a potential for future harm ensues.
In coming to its conclusion, the court found the following factors to be significant:
Shortly after the alleged abuse was disclosed to the mother, Bette Malachowski, a trained therapist familiar with the validation technique, conducted three separate interviews with the child and concluded that no abuse had taken place. She furthermore was suspicious of the mother’s motivation and stated that in her report. When Ms. Malachowski testified many months later, she reiterated those concerns, and after having read Dr. Sack’s report while on the witness stand, recalled that the mother had made an almost exact verbatim statement to her that was attributed to the child in Dr. Sack’s report. While Dr. Sack impressed the court with his knowledge of verification techniques and syndromes extant when sex abuse is alleged, less weight was given to his report and testimony since he only had one interview with the child which occurred many months after the alleged incident or incidents.
"Children who have experienced bona fide sexual abuse generally have a fairly clear visual image of the experience and recall it fairly clearly when asked to do so. The lack of such an internal visual-mental image clearly differentiates the fabricator from the child who has been genuinely abused. And this difference results in the fabricator’s difficulty in providing *800 specific details of the event(s) when asked to do so * * * When asked to provide details, the youngster is either unable to do so or creates a scenario for the purposes of the interview. However, in subsequent interviews a different scenario may be presented. It is common knowledge that no one’s memory is good enough to be a good liar and children even less so. In contrast, the child who has suffered bona fide sexual abuse will usually provide specific details, and they will be consistently the same on subsequent interviews.” (Gardner, The Parental Alienation Syndrome and the Differentiation Between Fabricated and Genuine Child Sex Abuse, at 110 [1987].)
Mandi’s descriptions of sexual activity between herself and her father vary considerably depending upon whether she was talking to social services caseworkers and Jan Carter, all of whom were perceived to be friends and former working associates of her mother, and professionals such as Bette Malachowski, Dr. Larry Horowitz and Dr. Sack. The closest thing to consistency was the child’s statement to Dr. Sack which was almost a verbatim recitation of what the mother had told Bette Malachowski seven months earlier. It was Dr. Sack, on cross-examination, who stated that the child may identify with and parrot the parent she is most bonded to.
"The child who is fabricating sexual abuse generally does not describe fear of the perpetrator and is usually free from tension in the perpetrator’s presence.” (Gardner, op. cit., at 115.) There was no credible testimony to suggest that the child was afraid of her father and in fact the testimony suggested a relaxed and warm relationship.
"Sexually abused children may talk frequently about sex, to the point of obsession. They may be preoccupied with the desire to play sexual games with other children (especially exhibitionistic and voyeuristic) and/or may become compulsive masturbators (privately and publicly). They may become preoccupied with doll play in which sexual encounters (especially their own) are portrayed. In contrast, children who are fabricating sex abuse generally exhibit no such preoccupation with sex — other than at those times when they are asked to describe the scenarios related to the sexual encounters with the alleged perpetrator.” (Gardner, op. cit., at 116.) There was no testimony to suggest that Mandi had any awareness of her sexuality nor had become involved in any sexual activity.
Dr. Gardner also suggests that children who have been *801 genuinely sexually abused are often depressed, withdrawn, compliant, are regressive and may suffer from psychosomatic disorders together with other factors that he considers important in differentiating the fabricator from the bona fide victim. (Gardner, op. cit., at 118-124.) Of significance in this case is the element of chronicity. Dr. Gardner states "By the time bona fide sex abuse comes to the attention of others, it may have been going on for a long period. Fabricating abusers more often describe only one or two experiences, which is deemed to be enough for the purposes of the litigation.” (Gardner, op. cit., at 122.) None of the adults to whom Mandi made disclosures could conclude with any certainty that Mandi was describing one or more than one experience.
In addition to the above factors, the court had the unique opportunity of observing the demeanor of all witnesses who appeared before it and concludes that the testimony of the father is more credible than that of the mother. The mother remained stoic through six days of trial including the time that she was on the witness stand.
The court also concludes as did Bette Malachowski and the Law Guardian that it is likely that the mother programmed her daughter to accuse the father of sexually abusing the child so that she could obtain sole custody and control or even preclude any contact that the father might have with his daughter.
In the opinion of this court, any parent that would denigrate the other by casting the false aspersion of child sex abuse and involving the child as an instrument to achieve his or her selfish purpose is not fit to continue in the role of a parent.
In the case before the court, Karen B. has sought to destroy the reputation of her former friend and lover by accusing him of one of the most heinous crimes known to man. The aura of the allegation, irrespective of its falsehood, may stand over him and affect him for the rest of his life. Likewise, by involving her own daughter in her nefarious scheme, she may have inflicted irreparable psychological damage on her. Like Medea, she is ready to sacrifice her child to accomplish her selfish goal.
Considering the totality of circumstances surrounding these parties and their daughter, the court finds that it is in the best interests of Mandi that her custody be placed with her father.
*802 As the court has no assurance that the mother will not continue to "brainwash” or "program” Mandi, petitioner shall have no visitation nor contact with her daughter. That prohibition is to continue until the court is satisfied that the parties comprehend the magnitude of what has happened and that no further danger is presented to the child. To that end and with the hope that a more normal relationship will develop between the parties and the child and with each other, the Probation Department of Fulton County is directed to formulate a program including, if necessary, psychological or psychiatric consultation and treatment for all members of the family. The Probation Department shall advise the court in writing within 30 days from the date of this order of the program and shall thereafter inform the court in writing every month for a term of six months as to whether or not the parties are complying with its directives. If the Probation Department determines that visitation between the child and mother should commence, it shall so notify the court with its proposal.
All petitions alleging family offenses or violations of temporary orders of protection are dismissed for failure of proof.

 Sex Abuse In Divorce.