■ In the Matter of John A., Respondent, v Bridget M., Appellant. [791 NYS2d 421]—

Order, Family Court, New York County (Arlene D. Goldberg, J.), entered June 29, 2004, which, in an "expanded" determination, inter alia, granted the father's petition for custody of the subject children on the condition that he reside within 40 miles of the New York metropolitan area where respondent mother resides, unanimously modified, on the law and the facts, the father's petition for custody denied and custody restored to the mother, the order affirmed insofar as it directed the mother not to make any negative comments to the children about the father or the custody award and further directed the mother not to permit Pam S. to have any contact with the children, without costs or disbursements, and the matter remanded to Family Court for further proceedings pursuant to Family Court Act § 656. Appeal from order, same court and Judge, entered May 22, 2004, which, inter alia, awarded custody to petitioner father, unanimously dismissed, without costs or disbursements, as superseded by the appeal from the order entered June 29, 2004. Appeal from order, same court and Judge, entered May 22, 2004, which, inter alia, denied respondent mother's motion to reopen the fact-finding hearing on the ground of newly discovered evidence, unanimously dismissed, without costs or disbursements,

as academic. Appeal from order, same court and Judge, entered July 1, 2004, which, inter alia, ordered that respondent mother have 24-hour supervised visitation, unanimously dismissed, without costs or disbursements, as academic. Appeal from order, same court and Judge, entered June 4, 2004, directing that respondent mother have monitored telephone calls with the children which neither party shall tape, unanimously dismissed, without costs or disbursements, as abandoned.

Saxe and Sullivan, JJ., concur in a memorandum by Sullivan, J., as follows: This is an appeal from a Family Court order transferring custody of four-year-old twin girls, born out of wedlock, who had resided with their mother from birth, to the father on the basis of a finding, after an evidentiary hearing, that the mother had coached the children to make false accusations of sexual abuse against the father and was thereby undermining his relationship with them. The evidence adduced at the hearing, which spanned 14 days and encompassed the testimony of 32 witnesses and 52 exhibits, is summarized as follows.

In 1998, petitioner John A. (the father), 48 years of age at the time, married and the father of four adult children, became romantically involved with respondent Bridget M. (the mother), a 32-year-old actress/model, residing in Manhattan, whom he met on one of his business trips to New York. An executive of a corporation based in St. Louis, Missouri, the father has residences in Manhattan and St. Louis, as well as the marital home, which he shares with his wife, in Malibu, California.

In early 1999, the mother discovered that she was pregnant. The father's wife learned of the affair and of the mother's pregnancy in April of the same year and filed for divorce in California. It should be noted that while the California divorce petition has not been pursued, it has never been withdrawn. According to the mother, the father and his wife telephoned her on several occasions, urging her to abort the pregnancy and offering her money to do so. On September 8, 1999, the mother gave birth to twin daughters, Scarlett and Amber.

While the mother testified that the father was excited about the prospect of starting a family with her and that he intended to leave his wife, the father denied ever expressing such an intention. And, although the mother testified that she wanted to marry the father, it is undisputed that she had been carrying on a simultaneous sexual relationship with another man, to whom she was engaged at the time of the hearing. Although the father refused to sign an acknowledgment of paternity at the hospital, he was listed as the father on the children's birth cer-

tificates. DNA testing performed shortly thereafter confirmed his paternity.

Although, as noted, the testimony was conflicting as to the father's intentions, Family Court, relying on the testimony of the mother's therapist, which it found credible, rejected his "protestations that he did nothing to give the mother cause to believe that he would leave his wife and build a life with [her] and the twins." At an October 2000 session that the father attended, he indicated to the therapist that he planned to divorce his wife and have the mother and the twins move with him to St. Louis.

The father's wife testified that after the events of September 11, 2001, she and the father decided to remain together. Notwithstanding, the father continued his relationship with the mother, "although the testimony indicates that there was a marked deterioration . . . after the father failed to divorce his wife by the fall of 2001." According to the father, from September 1999 through October 2002, he made more than 70 trips to New York, usually for business purposes, staying with the mother and the children 90% of the time. During these visits, he would parent the children, play with them, read to them and take them out. He also provided monthly financial support. He testified that the mother sometimes evinced jealousy, complaining that he was not paying sufficient attention to her. The mother, on the other hand, testified that the father visited with the children only when it was convenient during his visits to New York and that it is she who raised, nurtured and cared for them since their birth. While the father continued to live in California and Missouri, she not only provided the twins' day-to-day care but made all the decisions regarding their emotional, physical, educational and religious development.

On September 30, 2002, after the parties' relationship had ended, the father filed a Family Court petition for an order of filiation, even though his paternity had been established at birth. The mother contested the petition and, questioning the reliability of the DNA test arranged by the father after the births, demanded that another DNA test be performed. The effect of the mother's actions was to leave the father, pending receipt of the results, without any legal right to see the children. Visitation was arranged only with the mother's permission.

On February 4, 2003, upon receipt of positive DNA results, the father filed a petition in Family Court for visitation. The mother requested that any visitation be supervised because,

since their infancy, the father had been acting in a sexually inappropriate manner with the children, playing with them roughly, exposing his genitalia to them and making lewd comments to her about their genitalia. On the basis of these allegations, the court, pending investigation, ordered supervised visitation. The parties stipulated that Linda Ehrenfreund, a social worker, would act as supervisor and, on April 14, 2003, the court appointed Stephen Bates Billick, M.D., qualified as an expert in psychiatry, forensic child psychiatry and child sexual abuse, as the neutral forensic evaluator.

Between March 2003 and the commencement of the hearing on November 3, 2003, the father's visitation was supervised by three different social workers, Ehrenfreund for visits on March 29, April 19 and April 20 and Jewel Roberts for all visits beginning May 18, except for those on June 15, September 13 and 14 and October 11 and 12, when social worker Traci Shinabarger supervised visitation. The mother claimed that the father had molested Scarlett in the bathroom of his apartment either on April 19 or April 20, while Ehrenfreund was supervising visitation. She also claimed that the father had molested Amber during Roberts's watch, on a July 12 visit to Central Park, when he had taken Amber to the bathroom.

The mother testified that after the twins returned home from the April 20 visit, Scarlett called out to Pam S., a family friend/nanny, that she needed help and asked her to wipe her like Daddy did without using toilet paper. When instructed to tell her mother, Scarlett told the mother that "Daddy touched my peepee and he didn't use toilet paper." Pam S. called the State Central Agency to report that both children had been touched; the Administration for Children's Services (ACS) was also notified and criminal investigations ensued. On May 14, 2003, at the mother's request, Family Court appointed Roberts to replace Ehrenfreund.

According to the mother, the twins had told her that Roberts was absent for periods during the visits she supervised, prompting the mother to hire a private investigator to follow and videotape the visitation. The mother testified that after the July 12, 2003 visit to an amusement park, Amber told her that the father had "touched her peepee in the bathroom." According to the mother, Scarlett told her that the father was in the bathroom with Amber "for a long time," while she was outside holding his wife's hand. According to the private investigator, Roberts could not see the bathroom from where she was sitting. Over the next few days, Amber began complaining about irritation in her vaginal area, which, on examination, was red and

inflamed. The mother took both children to the Cornell Medical Center emergency room, where they were diagnosed with vaginitis, and, on referral, to a doctor at Cornell the next day. Based on this diagnosis and Amber's account of the bathroom incident, the mother moved to suspend the father's visitation pending an investigation. In turn, the father moved to amend his visitation petition to one seeking custody. The court granted the motion to amend but did not suspend visitation.

Aside from his own testimony and that of his wife, the father's case consisted of the testimony of his four adult children attesting to his uniformly appropriate behavior towards them, the social workers who had supervised his visitation, as well as the ACS Child Protective Specialist who investigated the complaint and found it "unfounded" and, most notably, the report and testimony of Dr. Billick. Distilled to its essence, the father's case was that: the sexual abuse allegations were unfounded; respondent had coached the children to make false statements about their father; the charges were either made maliciously to frustrate visitation or were the product of the mother's delusional thinking; the mother's inability or unwillingness to foster the father's relationship with the children made her unfit to be the custodial parent; she was incapable of placing the needs of the children above her own; the father would be the better custodial parent and, although the children would experience significant stress and anguish as a result of any change in custody, in the final analysis, they would benefit from such a change.

The mother called four expert witnesses, including Dr. Celia Blumenthal, a child psychiatrist who had five therapy sessions with the children at the time of the alleged abuse and found the complaints of sexual abuse to be reliable, and the therapist to whom the father expressed his intention to leave his wife for the mother and the twins. The mother also called an investigator in the Police Department's Manhattan special victims unit assigned to investigate the criminal allegations of sexual abuse, who testified that she was unable to determine whether the charges were true and that the investigation remained open. Dr. Blumenthal further testified that the trauma and psychological damage that the children would suffer from a change of custody would be long term because of their age and the strong bond they had developed with their mother. The mother also called numerous character witnesses, including the director of the nursery school attended by the twins since September of 2002, who testified that the mother's relationship with them was "warm, loving, caring, very appropriate." She found the

children's development to be "very appropriate[,] [n]ormal, no issues."

The essence of the mother's evidence was that: she and the children were strongly bonded; she is an excellent parent who puts the children's needs ahead of her own; she did not interfere with the father's relationship with the children and has the capacity, as the custodial parent, to facilitate his relationship with them; and she is not delusional and did not make up the abuse allegations. She argued that even if the allegations were contrived, the appropriate remedy is not the loss of custody of the children but, rather, treatment and that it would be extremely detrimental to the children to remove them from the parent who had been, since birth, their primary caretaker. A major thrust of the mother's case was addressed to discrediting Dr. Billick's report and testimony recommending a change in custody.

The Law Guardian presented a case in support of the father consisting of the testimony of Lisa Lubell, a certified social worker from Lawyers for Children, who was qualified as an expert with a specialty in child sexual abuse. Lubell expressed the opinion "with a high degree of certainty [that] these children were not sexually abused by their father" and recommended that it was in the best interest of the children that custody be awarded to the father in New York with liberal visitation to the mother. Julie Dowling, also qualified as an expert in social work and employed by Lawyers for Children, concurred in Lubell's opinion.

At the conclusion of the Law Guardian's case, the father and his wife were recalled to testify that if the father were granted custody they would relocate to New York City. Thereafter, on April 27, 2004, the mother sought to reopen the hearing to present newly discovered evidence that, during the hearing, the father was involved in an affair with another woman. Although supported by an affidavit from the woman's former husband, the motion was denied.

In a May 21, 2004 original decision supplemented by a June 28, 2004 expanded decision, Family Court awarded custody of the twins to the father, conditioned on his living within 40 miles of the New York City metropolitan area, with supervised visitation to the mother, who was directed not to permit any contact between Pam S. and the children. Transfer of custody was deferred until June 1, 2004, the completion of the school year. In reaching its decision, Family Court relied primarily on the testimony of Dr. Billick, Lisa Lubell and Julie Dowling, all of whom recommended that the father be awarded custody. The

court found that the testimony and recommendations of the mother's experts were "of little probative value" since none of them performed forensic evaluations of the father and mother or of the children.

The court supported its factual findings by application of the legal principle that a custodial parent's willful deprivation of the noncustodial parent's visitation rights constitutes "an act so inconsistent with the best interests of the children as to, per se, raise a strong probability that the [parent] is unfit to act as a custodial parent," quoting *Entwistle v Entwistle* (61 AD2d 380, 384-385 [1978], *appeal dismissed* 44 NY2d 851 [1978]). It relied on *Matter of Karen B. v Clyde M.* (151 Misc 2d 794 [1991], *affd sub nom. Matter of Karen PP. v Clyde QQ.,* 197 AD2d 753 [1993]), for the proposition that two instances of false accusations will justify a change in custody. The court further found that the father was an experienced and caring parent, loved by the twins, and that he would be capable of fostering a relationship with their mother, while she was incapable of reciprocating. While the father's extramarital affairs impact on his ability to be a good husband, the court held, they do not affect his ability to be a proper custodial parent. The orders entered on both of these decisions are before us on appeal as is the order denying the motion to reopen the hearing to consider newly discovered evidence. I would modify and deny the father's petition for custody.

Despite disagreement with its ruling on custody, I acknowledge that Family Court correctly found that the sexual abuse allegations were false and that the children had been coached, a determination that turned, in large part, on the court's observation of demeanor and its assessment of the credibility of the witnesses and the character, temperament and sincerity of the parties involved (*see Eschbach v Eschbach,* 56 NY2d 167, 173-174 [1982]; *Fanelli v Fanelli,* 215 AD2d 718, 719 [1995]). That finding, however, does not lead inexorably to the conclusion that custody should be awarded to the father. The custody determination turned largely on the testimony and report of Dr. Billick, the neutral forensic evaluator and only witness at the hearing to advocate relocation of the children to California; a recommendation, ultimately rejected by the court, that borders on the punitive.

Notwithstanding Dr. Billick's conclusion that the mother had engaged in conduct undermining the father's relationship with the children, he found nonetheless that: the children functioned at an appropriate level; Amber had a positive relationship with the father; the children want to see the father, enjoy being with

him, and are comfortable with him; they have a warm attachment to the father and showed no adverse behavior towards him and even have affection and fondness for the father's wife. Thus, despite the finding that the mother was attempting to undermine the relationship between the father and the children, the relationship was, in fact, a healthy one, one that even yielded affection and fondness between the children and the father's wife.

Moreover, Dr. Billick also found that the mother is a "good enough mother" who demonstrates general day-to-day competency in that regard. Ms. English, the director of the nursery school attended by the children, found the mother's relationship with the children to be "warm, loving, caring and very appropriate." She described the children as respectful to teachers, happy, able to relate well to the other children and having good social skills.

Thus, the hearing testimony established that the father had a good relationship with the children, unimpaired by the mother, that he visited with them prior to and throughout the proceeding and enjoyed daily telephone calls with them while they were in the mother's custody, and that the mother was a good mother, a fact tellingly demonstrated by the children's social skills and development. In such circumstances, it was not in the children's best interest to award the father custody and to subject them to the trauma of being separated from their primary caretaker since birth and removal from the only home they have ever known. The appropriate response to the mother's unacceptable conduct, that is, using the children as pawns in her battle with the father is, as Dr. Blumenthal opined, not removal from the mother's custody, but treatment of her condition.

In that regard, Family Court Act § 656 provides for the imposition of an order of probation with mandatory participation in programs of treatment, counseling and rehabilitation for her problem (see Matter of Mongiardo v Mongiardo, 232 AD2d 741 [1996]; see also Matter of Lamirande v Lamirande, 251 AD2d 1071 [1998], lv denied 92 NY2d 809 [1998]). The matter, after restoration of custody to the mother, should be remanded to Family Court to fashion the appropriate remedy.

Under the foregoing analysis, the appeal from the denial of the mother's motion to reopen the hearing to consider newly discovered evidence demonstrating that the father had engaged in another affair during the hearing is academic. It should be noted, however, that the proffered evidence, if credible, bore on the father's claims that he and his wife had decided to stay together and were relocating to New York, a subject he

introduced. Indeed, the record is bare, other than the testimony as to the intention to relocate in New York, as to who will care for the children while the father travels on business. The facile claim, on oral argument, that the father will parent the children "24/7" rings hollow.

Finally, it seems apparent, in reviewing this record, that the ultimate decision as to the key issue in this case, i.e., whether to award custody to the father because of the mother's attempts to undermine his relationship with the children, was made on the basis of the experts' testimony. Courts should be ever mindful that, while the forensic expert may offer guidance and inform, the ultimate determination on any such issue is a judicial function, not one for the expert.

In this regard, it should be noted that there is an ongoing debate in both the legal community and the mental health profession as to the implications of expert psychological opinion in custody litigation, especially when the opinion is a conclusion as to the ultimate determination as to where to award custody so as to serve the child's best interest (Tippins, Matrimonial Practice, *Custody Evaluations—Part IX: Babies, Bathwater and 'Daubert,'* NYLJ, Nov. 5, 2004, at 3, col 1; *see also* Tippins, Matrimonial Practice, *Custody Evaluations—Part X: 'Daubert' and Its Progeny Parsed,* NYLJ, Jan. 7, 2005, at 3, col 1; Caher, *Experts Challenge Family Court's 'Best Interests of Child' Standard,* NYLJ, Feb. 22, 2005, at 1, col 4).* Indeed, "the American Psychological Association . . . Guidelines for Child Custody Evaluations expressly note [that] 'the [mental health] profession has not reached consensus about whether psychologists ought to make recommendations about the final custody determination to the courts' " (Tippins, Matrimonial Practice, *Custody Evaluations—Part IX: Babies, Bathwater and 'Daubert,'* NYLJ, Nov. 5, 2004, at 3, col 1).

Tom, J.P., and Friedman, J., concur in a separate memorandum by Friedman, J., as follows: Under the particular circumstances of this troubling case, we agree that custody of the twin girls should be returned to their mother, notwithstanding certain well-supported fact-findings by Family Court that would, in most cases (although not as a per se rule), warrant an affirmance of the order awarding custody to the father. Notwithstanding our concurrence in the return of custody to the mother, it seems to us that the ultimate legal issue of which parent

---

* Chief Judge Judith S. Kaye has created a Matrimonial Commission to examine "every facet of the divorce process," including the roles of forensic experts and law guardians (*see* News in Brief, *New Commission to Examine Divorce Process,* NYLJ, June 2, 2004, at 1, col 1).

should have custody is very close, while the central factual issue in this case—whether the mother coached the children to make false allegations of abuse against the father—is not close at all. In these respects, our view of the case differs from that of Justice Saxe, in particular, and also from that of Justice Sullivan.

The unmarried mother, who resides in New York City, had custody of the twins from their birth in September 1999 until June 2004, when the father—the husband of another woman, and up to then primarily a resident of California and Missouri— took custody of the girls pursuant to the orders now under review. Although it is essentially undisputed that the mother is a fit parent in other respects, Family Court determined to grant custody to the father, conditioned on his moving to the New York City area, based largely on the finding—for which there is ample support in the record—that the mother coached the girls to make false accusations that their father sexually abused them. The Law Guardian and the neutral expert witnesses who testified in this case—the psychiatrist appointed by the court as the independent forensic evaluator, two certified social workers retained by the Law Guardian, and two social workers who supervised the father's visitations during the pendency of the proceedings—all take the view that the accusations are false, and that the children were coached to make them. Even the expert witnesses called by the mother seem to have recognized that the accusations were made in a manner consistent with coaching. Apart from the opinions of the Law Guardian and the neutral experts, the accusations—that the father twice touched a child (a different twin on each occasion) inappropriately, each time during a *supervised* visitation—are, as even the mother's psychiatric expert witness seems to have recognized, difficult to believe. We note that the father, a successful middle-aged businessman, has no prior history of inappropriate conduct with children, including the four children from his marriage (who are now adults) and his grandchildren.

Certainly, the record fully supports Family Court's determination that the sexual abuse accusations against the father are unfounded, and, unlike Justice Saxe, we reach this conclusion without hesitation. Family Court made that determination after hearing the live testimony of all the witnesses—not only the experts, but also, most pertinently, the mother and father themselves—and based on a thorough, reasoned analysis of all the evidence before it. Plainly, Family Court was best situated to assess both the witnesses' credibility and the parties' respective personalities, character and temperament (*see Victor L. v*

*Darlene L.*, 251 AD2d 178 [1998], *lv denied* 92 NY2d 816 [1998]). It is clear from reading Family Court's 36-page decision that the court reached its conclusions after a painstaking consideration of the testimony of all the witnesses, and on its independent assessment of the credibility and character of each party. The court did not simply rubberstamp the conclusions of any expert witness, neutral or otherwise. Any suggestion that the court relinquished its role as judge of the children's best interests to one of the experts is not supported by the record.

We have previously recognized that a parent's programming an impressionable child to make unfounded accusations of sexual abuse against the other parent is "inconsistent with the best interests of the child" (*David K. v Iris K.*, 276 AD2d 421, 422 [2000]; *see also Young v Young*, 212 AD2d 114, 118 [1995]; *Matter of Karen PP. v Clyde QQ.*, 197 AD2d 753, 754 [1993], *affg Matter of Karen B. v Clyde M.*, 151 Misc 2d 794 [1991]). Indeed, any conduct by a parent that wrongfully interferes with the child's relationship with the other parent raises a serious question as to the offending parent's fitness (*see Victor L. v Darlene L.*, 251 AD2d at 179; *Entwistle v Entwistle*, 61 AD2d 380, 384-385 [1978], *appeal dismissed* 44 NY2d 851 [1978]). While these principles certainly provide guidance, child custody disputes, by their very nature, must be analyzed on a case-by-case basis. We do not suggest that there is any per se rule requiring transfer of custody from the interfering parent to the other parent, or even that the interference, once terminated, gives rise to a rebuttable presumption in favor of a change of custody. Obviously, each case must be decided on the basis of its particular facts.

Taking into account all of the particular facts of this case, and notwithstanding the false accusations against the father, we ultimately cannot conclude that it was in the best interests of these very young girls to remove them from the custody of their mother, with whom they had lived—and, for the most part, thrived—for their entire lives. As Family Court recognized in conditioning the award of custody to the father on his relocating to the New York City area, there is no justification on this record for abrogating the mother's role in the children's lives, which, as a practical matter, would have been the result of allowing the father to move the children to California, as he proposed. While the father and his wife testified to their willingness to make their primary residence in this area, it is clear from the record that the father is a man who travels frequently on business. That his business interests are based in distant states means that a move to New York would only increase the already large proportion of his time spent away from home.

Thus, to award custody to the father would mean that the children would be raised by their stepmother (the father's wife) or by paid caregivers. While such individuals may be able to provide adequate care, the children are entitled to be raised by a parent. In the face of these complex familial circumstances, the better exercise of judicial discretion is to keep these young twin girls with their mother.

As for the mother, the record shows that her having custody of the children through the time of Family Court's decision did not prevent the children from enjoying a loving relationship with the father during his visitation with them within that period. Indeed, on appeal, the mother relies on this as a point in her favor. The mother also points out that, since July 2003, the children have not been induced to make any further unfounded accusations against their father. In addition, the record shows that an adult who had access to the children while they lived with the mother may have had a major role in planting the false accusations in the children's minds. We note that this Court, in its disposition of the appeal, is not disturbing Family Court's direction that the mother not permit that adult to have any further contact with the children.

Although we join in the decision to restore custody to the mother, we disagree with the cast Justice Saxe places on her past misconduct. It is psychologically abusive for a parent to plant in the mind of a three- or four-year-old child the false notion that the other parent is sexually abusing the child. The record in this case shows that, fortunately, the mother has desisted from misconduct of this kind for a substantial period of time. Thus, we have reason to expect that such misconduct will not be repeated in the future.

To sum up, we believe that, under the totality of the circumstances, custody should be returned to the mother under the conditions indicated. The mother should realize, however, that the custody issue may be revisited if she again seeks to interfere with the father's relationship with the children (*see Victor L. v Darlene L.*, 251 AD2d at 179). While we recognize that Family Court's action imposed great distress on the mother, it bears noting that this predicament is one the mother brought on herself by seeking to alienate the children from their father. It is in the mother's power to maintain custody by refraining from further abuse of her power as the custodial parent.

Saxe, J., also concurs in a separate memorandum as follows: I find it necessary to join the majority in a separate concurring opinion, in order to clarify that the case law, holding that a custodial parent's "interference with the relationship between a

child and the noncustodial parent [is] ' "an act so inconsistent with the best interests of the child as to, per se, raise a strong probability that the [offending party] is unfit to act as custodial parent" ' " (*Young v Young*, 212 AD2d 114, 122 [1995], quoting *Daghir v Daghir*, 82 AD2d 191, 194 [1981], *affd* 56 NY2d 938 [1982]), does *not* justify applying a per se rule requiring a change of custody, or even a rebuttable presumption that custody should be changed. Rather, such a finding constitutes one fact, albeit an important one, in determining the best interests of the children. The present case illustrates how a failure to adequately consider all the pertinent information may result in a change of custody that, despite the custodial parent's misconduct, is not in the best interests of the children.

This case concerns twin girls born out of wedlock, who were raised and cared for solely by their mother from their birth to the time of the trial, when they were four years old. Petitioner, the girls' biological father, is a married man with grown children. When the father began this extramarital affair with the mother in 1998, he was a 48-year-old successful and wealthy executive, and the mother was a 32-year-old model and actress. After the twins were born on September 8, 1999, the father raised no question as to the mother's abilities as a custodial parent; indeed, notwithstanding criticisms he made about her during trial, the father apparently had no compunction about leaving the children in her sole care during their first three years, while the parties' affair was ongoing, and his own participation in their care was limited to his visits.

Although the father's wife initially threatened divorce upon learning of this affair, the father and his wife ultimately decided to remain married. The parties' affair ended in September 2002, and thereafter their legal battles began. The father filed for an order of filiation, which the mother contested, despite a DNA test performed at the infants' birth. After the new DNA test once again confirmed the father as the twins' father, he commenced a visitation proceeding. The mother countered by requesting that he be awarded only supervised visitation, because she claimed that he had acted in a sexually inappropriate and reckless manner with the children since they were infants. Even with the supervision of visitation, however, the mother began to make claims of misconduct and sexual abuse, alleging incidents that took place while the court-appointed supervisor was not present. In July 2003, the mother moved to suspend all visitation between the father and the twins, and the father then amended his visitation petition to one seeking custody.

After trial, custody of the twins was transferred to the noncustodial father primarily based upon the Family Court's conclusion that the mother, having elicited false abuse allegations against the father, was incapable of facilitating a positive relationship between the children and their father. I consider this award to serve more as a punishment to the mother for her misconduct than as an appropriate custody award in the children's best interests.

Like my colleagues, I accept the finding that the mother coached the girls to make false allegations of sexual abuse, but I do so with some hesitation. The aspect of the finding that I find troubling is that it fails to sufficiently take into account the mother's state of mind, and the possibility that she could have sincerely, even if irrationally, believed that the father constituted a danger to the children, based upon a real, although slim, foundation.

In any event, however, even if the mother purposefully coached the girls to lie with the purpose of interfering with their relationship with their father, it would still be appropriate and necessary to consider other relevant and important facts and circumstances. An award of custody, especially when it is a removal of custody from a parent with whom the children are closely bonded, should not result from one discrete fact, but requires a weighing of *all* relevant factors and a determination that the new award will be in the children's best interests.

Despite the existence of case law seemingly supporting a custody award based solely on such a finding (*see e.g. Matter of Karen B. v Clyde M.*, 151 Misc 2d 794 [1991], *affd sub nom. Matter of Karen PP. v Clyde QQ.*, 197 AD2d 753 [1993]), it is always necessary to consider the totality of the circumstances when determining custody. Even when this Court observed that a parent's deliberately frustrating and interfering with the other parent's visitation rights and making false allegations of sexual misconduct "was inconsistent with the best interests of the child" (*see David K. v Iris K.*, 276 AD2d 421, 422 [2000]), the change of custody there was, properly, based upon the overall finding that "the child's emotional well-being was contingent upon custody being placed with plaintiff" (*id.; see also Matter of Juliet M.*, 16 AD3d 211 [2005]). The court must always consider all the relevant facts and arrive at the custody determination that is in the best interests of the children.

The foregoing is not intended to imply that coaching a child to make assertions of abuse against the other parent is excusable, or less than abhorrent. However, such misconduct may or may not harm the child or interfere with the child's relation-

ship with the other parent. Although Justice Friedman asserts that "[i]t is psychologically abusive for a parent to plant in the mind of a three- or four-year-old the false notion that the other parent is sexually abusing the child" as if this is an absolute fact, the question of the effect of such coaching on a child must be decided in each case. Moreover, the circumstances of the other parent must be taken into account as well; that parent may be substantially incapable of ensuring that the best interests of the child are being met.

My point is that a custody determination, especially one made after one of the parents has had de facto custody for years and is strongly bonded with the children, must, in addition to considering recent events of misconduct by the custodial parent, consider all other relevant facts and circumstances. Among other critical considerations relevant here are: (1) whether this was a pattern of malicious conduct that would be expected to continue for the foreseeable future, as opposed to a treatable, short-lived consequence of a bitter breakup, and (2) whether the household into which the father would be moving the children was one which would promote their best interests and well-being.

As both of my colleagues have noted, the father is a businessman who, throughout his career, has traveled frequently, and counsel's assurances that he intended to become a full-time parent lack credibility. If the father remains active in his business, the children would be left to be raised by the father's wife, whose potentially complex emotions toward the mother and the children were not satisfactorily explored at trial.

Given that the children have developed a solid relationship with their father while in their mother's custody, that no further false sex abuse claims have been made since July 2003, that in all other respects the mother's parenting abilities have been appropriate, and that some question may be raised about the propriety of having these girls raised by their stepmother without assurances that feelings of resentment would not cloud her views toward them, it becomes apparent that the award of custody to the father would amount to little more than a punitive measure, rather than a determination reflective of a proper weighing of all factors relevant to ascertaining the children's best interest. I therefore join with my colleagues in concluding that custody must be restored to the mother.

In these circumstances, in order to protect the best interests of the children, an approach to resolution of the dispute other than removing the girls from their mother's custody should have been explored. And, in general, given the frequency with

which accusations of sexual abuse crop up in the custody context, it is appropriate to consider the circumstances surrounding such an unsubstantiated claim, and to focus on what should follow. Some unsubstantiated claims may crop up out of malice; others, out of distrust stemming from the former couple's mistreatment of one another, or from suspicions harbored for years based on observations or comments made years earlier. Some parents, soon after an acrimonious breakup, give free rein to their resentment and bitterness, and attempt to "win" by somehow completely removing their former partner from their, and their children's, lives. When the focus is on protecting the children's best interests by assuring that both parents can maintain a healthy, positive relationship with the children, it becomes apparent that after rejecting a claim of sexual abuse, the next step must be to consider whether the accusing parent can become reconciled to the children's relationship with the other parent. The answer to that question will be critical to the larger determination of custody.

It was therefore incumbent upon the trial court in these circumstances to do more than simply award custody to the father on the theory that the mother sought to alienate the child from the father. For the sake of the children's emotional health, the court had an obligation to at least explore whether appropriate therapeutic assistance could successfully eliminate any concern that the custodial parent would take any further actions tending to alienate or separate the children from their other parent. [*See* 4 Misc 3d 1022(A), 2004 NY Slip Op 50992(U) (2004).]