◼ In the Matter of DANIEL P. GERBER, Respondent, v KIMBERLY A. GERBER, Appellant. (And Another Related Proceeding.) [21 NYS3d 386]—

Egan Jr., J. Appeal from an order of the Family Court of Saratoga County (Jensen, J.), entered October 16, 2014, which, among other things, in two proceedings pursuant to Family Ct Act article 6, modified a prior order of custody.

Petitioner (hereinafter the father) and respondent (hereinafter the mother) are the divorced parents of three teenage boys (born between 1998 and 2002). By order entered June 13, 2011, the parties agreed (following four days of testimony) to share joint legal custody of the children with alternating physical custody. That agreement, however, proved to be short lived, and the father thereafter filed two violation petitions alleging that the mother, among other things, denied him access to the children during his parenting time and/or scheduled vacation periods and persuaded two of the boys to falsely claim that he had menaced them with a knife.[1] In the interim, the mother filed a modification petition.

The mother thereafter commenced a divorce action, during the course of which the father requested modification of the prior custody order—asking that he be awarded "full custody." The then-pending Family Court petitions were transferred to Justice Ferradino in Supreme Court and, after the parties resolved their various matrimonial issues, extensive testimony was adduced (reportedly over the course of 1½ years) relative to, among other things, the issue of custody. Justice Ferradino retired prior to the conclusion of that hearing, and these matters were reassigned to Justice Chauvin in Supreme Court. Although Justice Chauvin offered to read the hearing tran-

---

1. The alleged menacing incident was investigated by the local Department of Social Services, and the initial report of suspected child abuse or maltreatment was deemed to be unfounded. Additionally, the criminal charges stemming from this purported incident, as well as the mother's unrelated allegations of stalking and harassment, were dismissed.

scripts and permit the parties to introduce additional testimony, the mother requested a de novo hearing,[2] whereupon these matters were transferred to Family Court.[3]

Family Court scheduled an initial appearance for August 8, 2014, and there is no dispute that, prior thereto, the court notified the parties in writing of the need to personally appear on that date. Family Court further advised that a failure to appear by either party would result in the dismissal of his or her petition and required that any claimed inability to attend the scheduled conference be supported by the affidavit of a treating physician—a requirement purportedly necessitated due to the mother's prior history in this regard. The mother failed to appear, and Family Court—deeming the affidavit tendered on the mother's behalf to be inadequate—denied her request to appear electronically and dismissed her modification petition. Family Court set aside four days for a hearing on the father's violation petitions and his request for a change in custody,[4] scheduled a prehearing conference for September 29, 2014 and warned counsel that if the mother failed to physically appear on that date, the court would enter a default judgment against her. The mother thereafter failed to appear, at which point Family Court advised the parties that the matter would proceed to a hearing on October 10, 2014—with or without the mother in attendance—and that the court was reserving the right to curtail the mother's proof due to her repeated failures to appear as directed.

When the scheduled hearing date arrived, Family Court—based upon an affidavit submitted by the mother's treating physician—agreed to allow the mother to appear by telephone. As a sanction for the mother's prior failures to appear (and taking into account that the mother's modification petition already had been dismissed), Family Court precluded the mother from offering her own witnesses; her counsel was,

---

**2.** The mother subsequently changed her mind and agreed to "continue the trial where it was left off," at which point the father objected to anything other than a de novo hearing.

**3.** The foregoing procedural history is as set forth in the various colloquies between counsel and Family Court; neither the mother's modification petition nor any other pleadings relative to the proceedings in Supreme Court appear in the record on appeal.

**4.** Although it does not appear that the father formally filed a modification petition, this issue was discussed at length during the course of the prehearing conferences conducted in these matters, the mother was on notice that the father's request for a change in custody would be addressed at the ensuing hearing and Family Court expressly agreed to hear evidence on this issue.

however, permitted to cross-examine the father's witnesses. On the second day of the hearing (during the course of the father's case-in-chief), Family Court modified this ruling to permit the mother to present evidence and rebuttal witnesses in response to the father's proof. At the close of all proof and after conducting a *Lincoln* hearing, Family Court granted the father's applications and, among other things, awarded the father sole legal and physical custody of the children and suspended all contact between the children and the mother for a period of six months, to be followed by therapeutic visitation. This appeal by the mother ensued.[5]

We affirm. As a threshold matter, we reject the mother's assertion that she was denied a fair hearing. With respect to Family Court's decision to curtail the mother's proof, Family Court's expectations of the mother—as well as the consequences of the mother's failure to comply with the court's directives—were clearly communicated in advance of (and at) the prehearing conferences. To that end, "Family Court is entitled to impose appropriate sanctions for uncooperative parents as long as the sanctions do not adversely affect the child's right to have issues affecting his or her best interest fully explored" (*Matter of Stukes v Ryan*, 289 AD2d 623, 624 [2001]).

Here, in light of the mother's documented failure to comply with Family Court's directives and the fact that she no longer had a petition pending before the court, we cannot say that Family Court abused its discretion in limiting the mother's participation at the hearing to the cross-examination of the father's witnesses and the opportunity to call rebuttal witnesses (*see Bean v Bean*, 53 AD3d 718, 721 [2008]). Notably, although counsel initially indicated that the mother "would love to testify" on rebuttal, the record clearly reflects that the mother thereafter rested without doing so—despite having been available and afforded the opportunity to testify by telephone. Additionally, at the mother's request, the parties stipulated that the July 2011 report authored by the mother's expert witness would be received into evidence in lieu of his testimony; hence, she cannot now be heard to complain that this expert was unable to personally appear.[6]

Finally, having reviewed the record as a whole, we are not

---

5. The mother's application for a stay pending appeal was denied by a Justice of this Court.

6. To the extent that the mother takes issue with Family Court's decision to hold a *Lincoln* hearing rather than permitting the children to testify in open court, three points must be made. First, although counsel for the mother indeed indicated that the boys wished to testify, when Family Court advised that it would hold a *Lincoln* hearing instead, counsel replied, "Okay, that's

persuaded that Family Court's decision to limit the mother's proof deprived her of a fair hearing or otherwise impaired our ability to address and decide the issues raised on this appeal (compare Matter of Jeffrey JJ. v Stephanie KK., 88 AD3d 1083, 1084 [2011]; Matter of Middlemiss v Pratt, 86 AD3d 658, 659 [2011]; Matter of Williams v Williams, 35 AD3d 1098, 1099-1100 [2006]; Matter of Stukes v Ryan, 289 AD2d at 624).

Turning to the merits, "[a] parent seeking to modify an existing custody order first must demonstrate that a change in circumstances has occurred since the entry thereof that is sufficient to warrant the court undertaking a best interests analysis in the first instance; assuming this threshold requirement is met, the parent then must show that modification of the underlying order is necessary to ensure the child's continued best interests" (Matter of Menhennett v Bixby, 132 AD3d 1177, 1179 [2015]; see Matter of Demers v McLear, 130 AD3d 1259, 1260 [2015]). The requisite change in circumstances may be established where the record reflects that the relationship between the parents has deteriorated "to the point where they simply cannot work together in a cooperative fashion for the good of their children" (Matter of Sonley v Sonley, 115 AD3d 1071, 1072 [2014] [internal quotation marks and citations omitted]; see Matter of Zahuranec v Zahuranec, 132 AD3d 1175, 1177 [2015]; Matter of Greene v Robarge, 104 AD3d 1073, 1075 [2013]).

Here, the father testified that, after the initial custody agreement was finalized in June 2011, it was "almost like a bomb went off." Within a short period of time, the mother, among other things, lodged various criminal charges against the father (all of which were dismissed), began withholding the children from him during scheduled visitations (prompting the ensuing violation petitions), made unilateral decisions regarding the children without consulting with him and, in contravention of

---

fine." Accordingly, we deem this issue to be unpreserved for our review (see Matter of Washington v Marquis, 97 AD3d 930, 931 [2012]). More to the point, the decision to hold a Lincoln hearing is a matter committed to Family Court's sound discretion (see id.), and we perceive no abuse of that discretion here. Finally, it bears repeating that, in the context of a Family Ct Act article 6 proceeding, "a Lincoln hearing is the preferred manner for ascertaining a child's wishes" (Matter of Battin v Battin, 130 AD3d 1265, 1266 n 2 [2015]). A child—regardless of age—"should not be placed in the position of having his or her relationship with either parent further jeopardized by having to publicly relate his or her difficulties with them when explaining the reasons for his or her preference" (Matter of Casarotti v Casarotti, 107 AD3d 1336, 1338-1339 [2013], lv denied 22 NY3d 852 [2013] [internal quotation marks, brackets and citations omitted]; see Matter of Battin v Battin, 130 AD3d at 1266).

a prior court order, refused to communicate with him except via the United States Postal Service. This unrebutted proof, in our view, is more than sufficient to demonstrate that joint custody simply is not workable, thereby triggering an inquiry as to which custodial arrangement would promote the children's best interests.

In this regard, although a best interests determination necessarily must be based upon the totality of the circumstances after giving due consideration to any number of relevant factors, evidence that one parent "intentionally interfered with the [other] parent's relationship with the children is so inconsistent with the best interests of the children as to, per se, raise a strong probability that the offending party is unfit to act as [a] custodial parent" (*Heather B. v Daniel B.*, 125 AD3d 1157, 1160 [2015] [internal quotation marks and citations omitted]; *see Matter of Harlost v Carden*, 124 AD3d 968, 968 [2015]; *Robert B. v Linda B.*, 119 AD3d 1006, 1008 [2014], *lv denied* 24 NY3d 906 [2014]). Here, the father testified at length regarding the change in the children's demeanor following entry of the prior custody order (and in the wake of the mother's various allegations of criminal activity)—including the children's refusal to, among other things, engage in any activities with him, participate in family dinners, wear clothes that he had purchased for them or respond to his repeated efforts to engage them in conversation and attempt to build a positive and respectful parent-child relationship. Additionally, a report authored by Mary O'Connor, the clinical psychologist who performed a court-ordered evaluation of the parties and children in late 2010, was received into evidence.[7] According to O'Connor, the mother, who refused to "fully participate in the psychological evaluation," evidenced a history of behavior that was "consistent with a diagnosis of [n]arcissistic [p]ersonality [d]isorder"—a disorder defined, in part, as "a pervasive pattern of grandiosity and entitlement." Specifically, O'Connor noted that the mother readily "blame[d] all of the difficulties for the children and the family on [the father]," "consistently portrayed herself as a victim," failed to "take any responsibility for any problems in the marriage or with the children" and "did not recognize any role for herself in the conflicts that affect[ed] the children." Notably, O'Connor opined that the mother's negative

---

7. Although O'Connor's report predated the order sought to be modified, it was marked as a Family Court exhibit, received into evidence without objection and was provided to and reviewed by Al Wolfer, a family counselor who testified on the father's behalf. Notably, Wolfer testified that his encounters with the mother were entirely consistent with the diagnosis rendered by O'Connor.

"remarks and behavior influence[d] the children to disrespect [the father] and resist participating in a healthy relationship with him." Indeed, O'Connor noted that one possible remedy for such parental alienation would be "to reverse custody and immerse the children in the primary custody and residence of the alienated parent," i.e., the father.

The father also offered the testimony of Al Wolfer, a court-referred family counselor who worked with the family from June 2011 to February 2012. Wolfer testified that the children, who eventually refused to participate in the counseling sessions, shared a "distorted reality" with their mother—one in which they possessed no positive experiences with or memories of their father—and opined that, during the time that he was counseling the family, the mother actively engaged in a "campaign of negativity and denigration" that was directed at alienating the children from their father. According to Wolfer, the children "were powerfully motivated by [their mother's] behavior" within the family unit and, to that end, understood "what they need[ed] to do" when they were with their father, i.e., refuse all attempts on his part to interact with them. Wolfer characterized this parental alienation as "moderate to severe" and opined that, to ensure the best chance of fostering a meaningful relationship between the father and the children, the children would have to be separated from their mother—without any contact—for six months followed by supervised visitations with a skilled therapist.

In light of the overwhelming evidence of parental alienation, which essentially was unrebutted by the mother,[8] and taking into account the traditional factors considered in a best interests analysis and the testimony offered relative thereto (*see Matter of Shokralla v Banks*, 130 AD3d 1263, 1264 [2015]), we have no quarrel with Family Court's decision to award sole legal and physical custody to the father. Although Family Court's determination admittedly was not in accord with the recommendation made by the attorney for the children, the children's wishes are informative rather than dispositive (*see Matter of Colona v Colona*, 125 AD3d 1123, 1126 [2015])—particularly where, as here, "the evidence received at the hearing supports the . . . finding that the child[ren] [have] been manipulated by one of the parties and the child[ren's] views

---

**8.** Although the report tendered by the mother's expert tended to lay the blame for the conflicted family dynamic at the father's feet, Family Court properly discounted the value of this report as it was based, in large measure, upon information supplied by the mother; notably, nothing in the report suggests that this evaluator ever met with the father.

regarding [their] relationship with the other party are the product of that manipulation" (*Matter of Burola v Meek*, 64 AD3d 962, 966 [2009]). Additionally, in light of the mother's documented behaviors and the opinions expressed by O'Connor and Wolfer, we cannot say that Family Court abused its discretion in suspending all contact between the mother and the children for a period of six months and thereafter ordering therapeutic visitation. The mother's remaining contentions, including her assertion that the father failed to sustain his burden of proof relative to the subject violation petitions, have been examined and found to be lacking in merit.

Garry, J.P., Rose and Clark, JJ., concur. Ordered that the order is affirmed, without costs.