Matter of Brown v Simon (2021 NY Slip Op 03831)





Matter of Brown v Simon


2021 NY Slip Op 03831


Decided on June 16, 2021


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on June 16, 2021
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

MARK C. DILLON, J.P.
LEONARD B. AUSTIN
ROBERT J. MILLER
COLLEEN D. DUFFY, JJ.


2019-05934
 (Docket Nos. V-9936-12/12A,12B, 12C, 12/18P,Q, V-9937-12/12A, 12/18J,K,L, V-4633-14, 14/18B,C V-2634-16, O-9733-15)

[*1]In the Matter of Matthew Brown, appellant-respondent,
v
Shanna Simon, respondent-appellant.


Lisa Colin, White Plains, NY, for appellant-respondent.
Gretchen Mullins Kim, P.C., Yonkers, NY, for respondent-appellant.
Eve Bunting-Smith, White Plains, NY, attorney for the child.



DECISION & ORDER
In related proceedings, inter alia, pursuant to Family Court Act article 6, the father appeals, and the mother cross-appeals, from an order of the Family Court, Westchester County (Arlene Katz, J.), dated April 30, 2019. The order, insofar as appealed from, after a hearing, (1) denied that branch of the father's petition dated September 6, 2012, which was, in effect, to modify a prior order of the same court entered August 14, 2012, on consent of the parties, so as to award him sole legal custody of the subject child, and (2) granted the mother's petitions, in effect, to modify the order dated August 14, 2012, to the extent of awarding her a minimum of eight hours per week of supervised, therapeutic parental access with the subject child, and directing the father to pay 80% of the cost of that supervised, therapeutic parental access. The order dated April 30, 2019, insofar as cross-appealed from, after the hearing, (1) granted that branch of the father's petition which was, in effect, to modify the order dated August 14, 2012, so as to award him sole physical custody of the subject child, and (2) granted the mother's petitions, in effect, to modify the order dated August 14, 2012, only to the extent of awarding her a minimum of eight hours per week of supervised, therapeutic parental access with the subject child, and directing the father to pay 80% of the cost of that supervised, therapeutic parental access.
ORDERED that the order dated April 30, 2019, is modified, on the law, on the facts, and in the exercise of discretion, by deleting the provision thereof granting the mother's petitions, in effect, to modify the order dated August 14, 2012, only to the extent of awarding her a minimum of eight hours per week of supervised, therapeutic parental access with the subject child, and directing the father to pay 80% of the cost of that supervised, therapeutic parental access, and substituting therefor a provision granting the mother's petitions, in effect, to modify the order dated August 14, 2012, to the extent that (a) the mother is awarded liberal, unsupervised parental access, which may be exercised, in whole or in part, in the mother's sole discretion and without prejudice to her, in a supervised, therapeutic setting; (b) the father is directed to pay 100% of the mother's parental access expenses, including travel expenses and expenses incurred in connection with any supervised, therapeutic parental access between the mother and the child; (c) the father is directed to engage the subject child in weekly reunification therapy or other professional counseling with the [*2]goal of rebuilding the relationship between the mother and the subject child; (d) the father is directed to pay 100% of the expenses associated with the weekly reunification therapy or other professional counseling directed herein; and (e) the parties are prohibited from making derogatory or denigrating statements concerning each other in the subject child's presence or in the presence of those who have contact with the child; as so modified, the order dated April 30, 2019, is affirmed insofar as appealed and cross-appealed from, without costs or disbursements, the order dated August 14, 2012, is modified accordingly, and the matter is remitted to the Family Court, Westchester County, for a hearing to be held with all convenient speed to establish an appropriate liberal unsupervised parental access schedule for the mother, and to arrange and supervise professional counseling for the subject child, consistent herewith.
The parties are the parents of the subject child (hereinafter the child), who was born in September 2010. Shortly before the child's birth, the mother moved into the father's home with her then-eight-year-old daughter from another relationship (hereinafter the child's older sister or the older sister).
In March 2012, the mother informed the children's daycare provider that the child's older sister had been sexually assaulted by a family member. The mother and the children moved out of the father's home in June 2012, and they moved in with the children's maternal grandmother.
Thereafter, on August 14, 2012, the parties entered into an agreement to share joint legal custody of the child, with the mother to have sole residential custody and the father to have liberal parental access with the child. That agreement was embodied in an order entered on consent of the parties on August 14, 2012 (hereinafter the so-ordered stipulation).
Sometime in August 2012, the father told the child's pediatrician, Georgina Lester, that the child was crying and fussing when her diaper was being changed by her daycare provider. Lester, after being told that the child's older sister had been sexually assaulted, advised the child's daycare provider to make a report to Child Protective Services (hereinafter CPS).
On September 4, 2012, the father filed a petition to enforce the so-ordered stipulation. On September 6, 2012, he filed a petition to modify the so-ordered stipulation so as to award him sole physical and legal custody of the child. The father alleged that the child had been sexually abused by her older sister while the child was in the mother's care. In support of these allegations, the father cited to the fact that the child's daycare provider reported that the then-two-year-old child was not allowing herself to be cleaned when her diaper was being changed. The father also alleged that the child told him that her older sister "did it." In response to these allegations, the mother filed a petition in which she sought sole custody of the child.
Before a hearing on the petitions could be held, the attorney for the child, based solely on certain out-of-court statements attributed to the daycare provider, made an application for the father to be awarded temporary custody of the child. The attorney for the child later acknowledged that he made this application before he had conducted a complete investigation into the father's allegations.
The Family Court, relying on the disputed hearsay allegations which had been proffered by the attorney for the child, granted the application and awarded the father temporary custody of the child, who was then two years old, pending a determination of the petitions. In directing the transfer of custody, the court relied on the father's accusation that the child had been sexually assaulted by her older sister while they were in the mother's care. The court awarded the mother parental access with the child, but prohibited any contact between the child and her older sister.
At a subsequent hearing on the merits of the petitions, the Family Court permitted the father to testify that the child, who was two years old at the time, told him that her older sister "did it." That hearsay statement was the only evidence presented to support the father's allegation that the child had been sexually assaulted by her older sister.
In addition to the father's hearsay testimony, the Family Court permitted, over the mother's objection, testimony from a physician who had treated the child's older sister. The physician's testimony was used by the father and the attorney for the child to support their argument that the child's older sister was "seriously disturbed" (Matter of Brown v Simon, 123 AD3d 1120, 1122).
Both CPS and the Administration for Children's Services (hereinafter ACS) investigated the allegations of sexual abuse and concluded that the allegations were unfounded. A nurse practitioner, who performs medical examinations of children who are suspected to have been abused or neglected, and who was qualified as an expert in the area of child abuse, testified that she had examined the child in the context of one of the investigations and concluded that there was no evidence that the child had been physically or sexually abused. She also testified that a two-year-old's resistance to having her diaper changed was not an indication that the child was being sexually abused.
After the hearing was concluded, in an order entered January 14, 2014, the Family Court determined that it was in the best interest of the child for the father to be awarded sole legal and physical custody of her. Accordingly, the court, among other things, granted the father's petition to modify the so-ordered stipulation so as to grant him sole legal and physical custody of the child. The court awarded the mother liberal parental access and prohibited her from leaving the child alone or unsupervised with her older sister. The court directed the mother to personally supervise all contact between the child and her older sister.
In March 2014, the mother filed a petition to enforce her parental access rights with the child. She alleged that since the January 14, 2014 order, the father had unilaterally determined the timing and conditions of her parental access with the child. The mother asked the Family Court to set a regular parental access schedule that would allow her to meaningfully participate in the child's life.
The mother also appealed to this Court from the January 14, 2014 order (see id. at 1120). In a decision and order dated December 31, 2014, this Court determined that the Family Court erred in awarding the father temporary custody of the child pending the determination of the petitions based solely on disputed hearsay allegations (see id. at 1121). With respect to the hearing, this Court determined that the Family Court erred in permitting the father's hearsay testimony that the two-year-old child told him that her older sister "'did it'" (id.). This Court also determined that the testimony of the older sister's physician was wholly improper, as it violated the older sister's privacy rights under the Health Insurance Portability and Accountability Act of 1996 (see id. at 1122).
In addition, this Court determined that "[t]he Family Court erred in failing to order forensic evaluations of the parties, their living environments, and the subject child prior to issuing a decision on the petitions" (id.). In the absence of such evaluations, the record was "inadequate to support the court's finding that it was in the best interest of the subject child for the father to be awarded sole custody of her" (id.).
This Court's December 31, 2014 decision and order reversed the January 14, 2014 order, and remitted the matter to the Family Court "for complete forensic evaluations of the parties, their living environments, and the subject child, for the appointment of a new attorney for the subject child, and for a de novo hearing and new determination of the petitions" (id. at 1120). This Court directed that "[w]hile the matter is pending for the evaluations, the de novo hearing, and the new determination on the petitions, the subject child shall reside with the mother, and the father's [parental access] with the subject child will be as set forth in the parties' custody agreement dated August 14, 2012" (id. at 1123).
In accordance with this Court's December 31, 2014 decision and order, beginning in January 2015, the terms of the parties' prior custody agreement, as embodied in the so-ordered stipulation, once again became operative. Therefore, the parties each had joint legal custody of the [*3]child, the mother had residential custody, and the father had liberal parental access. On January 5, 2015, the mother picked up the child from school in Ossining, where the father lived, and took the child back to the mother's home in Brooklyn.
In March 2015, the mother enrolled the child in therapy at the Center for Children of Promise, where she and the older sister also received therapy. The mother subsequently testified at the de novo hearing that she had contacted the father during this period to see if he would be willing to participate in mediation, but he did not respond.
The mother also testified that the father had parental access with the child for the Easter holiday on April 5, 2015, and was supposed to return her to the Barclays Center in Brooklyn that night. When the father failed to arrive at the Barclays Center at the appointed time, the mother contacted the father, who said he would return the child the next morning. The father, however, failed to return the child on Monday morning. The father did not return the child to the mother until after a petition for a writ of habeas corpus was filed with the Family Court.
The mother testified that this incident occurred shortly after the Court of Appeals denied the father's motion for leave to appeal this Court's December 31, 2014 decision and order. The mother testified that instead of returning the child to the Barclays Center as the parties had agreed, the father brought the child to Lester, her pediatrician.
Lester testified at the de novo hearing that in April 2015, the father brought the child, who was then four years old, to see her. During the visit, the child told Lester that her older sister was "touching [her] butt all the time." Lester asked the child follow-up questions, but the child did not answer them. Lester reported the child's statement to CPS.
The father brought the child to see Lester again in June 2015. Lester reported that during the course of this visit, the child pointed to her vaginal area and indicated that she was being touched by her older sister. As a result of this visit, Lester again contacted CPS.
In July 5, 2015, the father contacted Lester and reported seeing blood in the toilet after the child had a bowel movement. Lester advised the father to take the child to the emergency room.
On July 24, 2015, the father filed a family offense petition against the mother on the child's behalf, alleging that when he brought the child to his home earlier that month, she used the bathroom, and he saw that there was blood with her bowel movement in the toilet. He brought the child to the emergency room, and the doctors there called the Department of Social Services, who opened an investigation. The father's family offense petition was supported by a letter from Lester.
In response to the father's application, the Family Court issued an ex parte temporary order of protection against the mother dated July 24, 2015, requiring her to stay away from the child. With the issuance of this temporary order of protection, the child returned to live with her father in Ossining. The temporary order of protection against the mother was extended several times, until March 16, 2016.
In an order entered September 24, 2015, the Family Court granted the father's application and awarded him temporary residential custody of the child pending the determination of the outstanding custody petitions. The mother was only permitted to see the child, then five years old, in a supervised setting.
On March 16, 2016, the de novo hearing directed by this Court in its December 31, 2014 decision and order commenced, starting with the father's case. The father testified that since January 2015, during the seven-month period when the mother had regained residential custody of the child, there had been several new allegations to CPS and ACS that the child was being sexually assaulted by her older sister while the child was in the care of the mother. The father acknowledged that despite the numerous reports and investigations, there had never been an indicated report of abuse or neglect from ACS or CPS.
Lester testified that as a result of her report to CPS, the child had undergone a rape kit examination when she was about four years old, and that there were no findings as a result of that examination. Lester testified that she was not an expert in identifying sexual abuse, and that she never found any physical evidence of trauma in the course of her treatment of the child.
The mother testified at the de novo hearing in October and November 2017. She testified that since January 2015, she had been investigated six or seven times by ACS. She had met with two ACS caseworkers and two police officers concerning these investigations. Each ACS investigation has been based on an allegation by the father that the child's older sister sexually assaulted the child. The child's older sister was interrogated by the police in connection with these allegations. The mother testified that the child, who was five years old at the time of the hearing, had undergone two rape kit examinations in the course of these investigations.
The mother testified that since December 2016, she had only had parental access with the child in a therapeutic, supervised setting. The child had refused the last three visits before the mother testified at the hearing. The mother attempted supervised, therapeutic parental access on October 14, 2017, and the child yelled at the mother, and said the mother was a liar who had hurt her. The next parental access session, on October 28, 2017, started poorly, but improved. The mother testified that she attended a parenting class as recommended by the parental access supervisor.
The mother testified that the child's older sister moved to Arizona on July 17, 2016, to live with her father. The older sister's father made an allegation to CPS in Arizona that the mother had abused the older sister, which was investigated and determined to be unsubstantiated.
Mel Gluck, a psychologist who was the court-appointed forensic evaluator, submitted a report to the Family Court on July 30, 2015, and testified at the hearing in 2017. Gluck stated that he was unable to speak to the child alone because she was very resistant. When he met with each parent with the child for interaction interviews, and then sought to speak to each parent individually, the child had a temper tantrum and refused to allow him to speak to either parent alone. Gluck testified that he performed an interaction interview with the child and her older sister and that they had played well together. Both parents presented positively in their interaction interviews with the child.
Although he was aware that there was no finding that the child had ever been sexually abused, Gluck stated in his report that the child had "apparently" been sexually assaulted by her older sister. Gluck noted that the child, on at least one occasion in a professional setting, stated that her father told her to say that her older sister had touched her, but the child said that the allegations were not actually true.
Delia Farquharson, a licensed clinical social worker, provided the Family Court with a report concerning 12 visits she supervised between the mother and the child from October 14, 2017, until April 7, 2018. Her report concluded that the visits followed "a pretty consistent pattern." The child would arrive looking sullen or express a desire to avoid the visit. The supervisor and the mother would engage with the child to achieve some level of participation, and on most visits the child behaved consistent with having a positive experience, whistling, laughing, playing, touching, and eating. Farquharson reported that at the end of the visit, the child's mood would change to being sulky, rude, and dismissive. Farquharson opined that the child was caught in the middle of the parents' conflict, and invested in pleasing the father.
Kathleen McKay, psychologist for Westchester Jewish Community Services, performed a mental health evaluation of the parties and the child, and prepared a report which was submitted to the Family Court on April 16, 2018. Concerning the mother, McKay's report stated, inter alia, that she was "[u]nable or unwilling to entertain any personal responsibility related to allegations of maltreatment or mistreatment of [the child]."
Concerning the father, McKay's report stated that he reflected "an evident tendency towards impression management [and] externalization and evident desire to present in a positive [*4]light." The report stated that the father's "capacity for self-scrutiny and personal insight appeared limited and placed into question his contribution to current circumstance."
Concerning her observations of the child's interaction with the parties, McKay reported that the father's interaction was a positive one. As to the mother, the child had an "emotionally violent response" and abjectly refused to participate in an interaction with the mother, whom she accused of to lying to the police and giving her "pow-pow." When asked, the child refused to offer any explanation for these accusations.
Based on her evaluation, McKay testified that she did not believe the mother to be an imminent risk to the well-being of the child. The mother had no serious thought disturbance or maladaptive behavior that posed a risk to the child. However, it was clear that the child had developed a distinct distrust of the mother. McKay recommended that the parties engage a third party to try to ease the relationship, establish consistency, and integrate the mother back into the child's life in a meaningful way.
The Family Court conducted an in camera interview with the child on December 7, 2018. The child was eight years old at the time of that interview. The court questioned the child about, inter alia, the allegations of abuse involved in this case. After the hearing was concluded, the court issued an order dated April 30, 2019. The 45-page order summarized the reports, testimony, and other materials which comprised the record. The court made credibility determinations and other factual findings.
Notably, the Family Court did not conclude that the child had been sexually abused. The court stated that although "[the father's] concerns were largely legitimate at the outset, the father cannot credibly claim that the mother poses a demonstrable risk to [the child] during unsupervised [parental access] at this time." The court stated that "[t]he concerns that initially brought the father into this litigation no longer exist. What began as a desire to protect is now seriously overprotective and unproductive in a way that is hurting [the child]."
The Family Court found that the father had failed to encourage phone calls or parental access between the mother and the child. The court stated that "[t]he reports from the supervised [parental access], which are in evidence, are full of examples in which [the father's] words, actions and inactions belied his outward proclamations of support for visits with the mother."
The Family Court adopted the finding of McKay, who opined that the father was influencing the child's refusal to reconnect with her mother. The court also adopted McKay's conclusion that the child's "persistent and overtly expressed anger" toward her mother while she was in the father's care over the last two or three years indicated that the father had "influence[d] [the child] in a way that has either historically affected a perception that she has been physically maltreated by her mother, and/or . . . at present reinforces this impression whether it be by inaction or complicit passivity."
In the conclusion section of the order, the Family Court stated, among other things, that "[t]he father, who may have initially come from a place of genuine and legitimate concern, is likely now doing more harm than good with his overprotectiveness, active or passive demonizing of [the child's] mother, and failure to accept the importance of [the child] resuming a healthy relationship with her mother." The court stated that it could not determine "whether the father's actions stem from a misguided and obsessive sense of overprotectiveness or something more calculated."
The Family Court nevertheless agreed with McKay's opinion that "the extent to which [the child] exhibits overtly dysregulated behavior and emotion during visits with [her mother] suggests the necessity for continued supervision (preferably therapeutic) and close monitoring in conjunction with parent coaching (for both [the father] and [the mother])." The court adopted McKay's conclusion that, given the deterioration of the mother-daughter relationship, the child would be "unable to negotiate emotionally" any change to the mother's parental access at that time.
The Family Court indicated that it "strongly supported" the "mother's goal of having a normal relationship with [the child]." It nevertheless faulted the mother for "her view of herself as the victim, coupled with her failure to accept that [the child's] perception of her own history and reality, whether or not such perception is based in fact, has precluded her from meaningful participation in [the child'] therapy and healing."
The Family Court ultimately determined "by a preponderance of the evidence that it [was] in [the child's] best interests to remain living with her father at [that] time." The court's determination was "based upon . . . consideration of all of the testimony and evidence presented, reliance upon the information provided by both the forensic evaluators . . . and Ms. Farquharson, as well as the passage of time and the fact that [the child] has been residing in Ossining with [the father] as the primary caretaker for the last several years."
Given its determinations, in the April 30, 2019 order, the Family Court, inter alia, granted that branch of the father's petition which was, in effect, to modify the so-ordered stipulation so as to award him sole physical custody of the child. The court awarded the parties joint legal custody of the child. The court prohibited the mother from parental access with the child except in a supervised, therapeutic setting. The court stated that the mother was entitled to at least eight hours per week of supervised, therapeutic parental access with the child. The court directed the father to pay 80% of the cost of that supervised, therapeutic parental access.
The father appeals from the April 30, 2019, order. On appeal, the father contends that the Family Court properly granted him sole physical custody of the child, but that it should have also granted him sole legal custody of the child, instead of awarding the parties joint decision-making authority.
In addition, the father contends that the Family Court erred in awarding the mother eight hours per week of supervised, therapeutic parental access. The father contends that such parental access would "inappropriately encroach" on his own time with the child. The father contends that the mother's right to supervised, therapeutic parental access should be vacated altogether. He alternatively contends that the court erred in directing him to pay any share of the costs of the mother's supervised, therapeutic parental access.
The mother cross-appeals from the April 30, 2019 order. In her appellate brief, the mother contends that the Family Court erred in awarding the father sole physical custody of the child. The mother contends that the record demonstrates that the father continues to falsely claim that the child was sexually assaulted by her older sister on one or more occasion when the child was two or four years old. The mother contends that the record plainly shows that the father's influence over the child during the years when he enjoyed "temporary" custody has destroyed the mother's relationship with the child. Given the father's continuing allegations against the mother, he is incapable of cultivating a meaningful relationship between the mother and the child. The mother contends that she should be awarded sole physical custody of the child, and that the father should be awarded supervised parental access so long as he refuses to recognize the mother's right to have a relationship with the child and play an active role in her life.
In an appellate brief to this Court, the attorney for the child contends that the Family Court properly determined that there was a sufficient change of circumstances to support a change of custody to award sole physical custody to the father. She agrees with the Family Court's decision to grant the parties joint legal custody. However, she argues that it is not in the child's best interests for the mother to have a minimum of eight hours per week of supervised therapeutic parental access, based on the child's outright rejection of the parental access, and the projected cost of the parental access, which would ultimately enure to the child's detriment.
There is no prima facie right to custody of the child in either parent (see Domestic Relations Law § 240[1][a]; Friederwitzer v Friederwitzer, 55 NY2d 89, 93; Grunwald v Grunwald, 108 AD3d 537, 539; Matter of Andrews v Mouzon, 80 AD3d 761). The Family Court's paramount concern in any custody dispute is to determine, under the totality of the circumstances, what is in the [*5]best interests of the child (see Matter of Wilson v McGlinchey, 2 NY3d 375, 380-381; Eschbach v Eschbach, 56 NY2d 167, 171-172; Matter of Guzman v Pizarro, 102 AD3d 964).
Relevant considerations may include, but are not limited to, (1) which alternative will best promote stability; (2) the available home environments; (3) the past performance of each parent; (4) each parent's relative fitness, including his or her ability to guide the child, provide for the child's overall well being, and foster the child's relationship with the noncustodial parent; and (5) the child's desires (see Pandis v Lapas, 176 AD3d 837, 838-839; Matter of McPherson v McPherson, 139 AD3d 953, 954; Matter of Supangkat v Torres, 101 AD3d 889, 890).
"Since any custody determination depends to a great extent upon the hearing court's assessment of the credibility of the witnesses and of the character, temperament, and sincerity of the parties, its findings are generally accorded great deference and will not be disturbed unless they lack a sound and substantial basis in the record" (Matter of O'Loughlin v Sweetland, 98 AD3d 983, 984 [internal quotation marks omitted]; see Pandis v Lapas, 176 AD3d at 839; Matter of Griffin v Moore-James, 104 AD3d 685).
"[Parental access] is a joint right of the noncustodial parent and of the child" (Weiss v Weiss, 52 NY2d 170, 175; see Matter of Nixon v Ferrone, 153 AD3d 625, 627; Matter of Sanders v Jaco, 148 AD3d 812, 814). Inasmuch as "[t]he best interests of the child generally lie in being nurtured and guided by both parents" (Matter of Ross v Morrison, 98 AD3d 515, 517; see Matter of Zwillman v Kull, 90 AD3d 774, 775; Matter of Jules v Corriette, 76 AD3d 1016, 1017), "[i]t is generally in the best interest of the child for a rapport to be established with the noncustodial parent" (Matter of Schack v Schack, 98 AD2d 802, 802; see Zafran v Zafran, 28 AD3d 753, 755).
"In order for the noncustodial parent to develop a meaningful, nurturing relationship with [the] child, [parental access] must be frequent and regular" (Grunwald v Grunwald, 108 AD3d at 539 [internal quotation marks omitted]; see Twersky v Twersky, 103 AD2d 775, 775-776). Accordingly, "[o]ne of the primary responsibilities of a custodial parent is to assure meaningful contact between the child[ ] and the other parent" (Matter of Raybin v Raybin, 205 AD2d 918, 921; see Young v Young, 212 AD2d 114, 122), and some form of [parental access] by the noncustodial parent is generally appropriate, "absent exceptional circumstances, such as those in which it would be inimical to the welfare of the child or where a parent in some manner has forfeited his or her right to such access" (Weiss v Weiss, 52 NY2d at 175; see Matter of Gonzalez v Ross, 140 AD3d 869, 871; Zafran v Zafran, 28 AD3d at 755; Klutchko v Baron, 1 AD3d 400, 405; Matter of Eric L. v Dorothy L., 130 AD2d 660, 660-661; Janousek v Janousek, 108 AD2d 782, 784; Parker v Ford, 89 AD2d 806, 806-807).
Here, the weight of the evidence does not support the father's allegations that the child was sexually assaulted by her older sister during the periods in 2012 and 2014 when the child was in her mother's care. As outlined above, these allegations have been investigated numerous times, by numerous child welfare agencies, and have been repeatedly determined to be unfounded. None of the mental health experts who testified at the hearing in this case concluded that the child had been sexually assaulted and although the child underwent, among other testing, two rape kit examinations, there has never been any medical or physical evidence to support the father's repeated claims of sexual abuse.
The mother has never been found guilty of neglecting or abusing her children. None of the experts in this case determined that the mother posed any risk to the physical or emotional well-being of the child. To the contrary, they uniformly opined that it was in the child's best interests to have a relationship with the mother, with the help and support of the father. The record strongly supports the Family Court's determination that it is in the best interests of the child to have a relationship with her mother.
The father and the attorney for the child contend that, apart from whether the mother poses any actual risk of harm to the child, the mother's parental access was properly restricted due to the emotionally violent responses exhibited by the child during the more recent interactions with [*6]the mother. Although we recognize that the child's behavior in this case has posed substantial obstacles to the mother's parental access, from a legal standpoint, "[a] child's preference for a particular parent, while a factor to be considered, cannot be determinative" (Young v Young, 212 AD2d at 123; see Darema—Rogers v Rogers, 199 AD2d 456; Zucker v Zucker, 187 AD2d 507; Eric L. v Dorothy L., 130 AD2d at 660-661; Sturm v Lyding, 96 AD2d 731; Mahler v Mahler, 72 AD2d 739; Matter of De Biase v Scheinberg, 47 AD2d 657).
In weighing a child's expressed custody preference, "the court must consider the age and maturity of the child and the potential for influence having been exerted on the child" (Eschbach v Eschbach, 56 NY2d at 173; see Young v Young, 212 AD2d at 123). This is particularly true where there is evidence "that the [child's] feelings were fostered by the [custodial parent's] hostility towards the [noncustodial parent]" (Bubbins v Bubbins, 136 AD2d 672, 672; see Matter of Burola v Meek, 64 AD3d 962, 966; Zelnik v Zelnik, 196 AD2d 700; O'Connor v O'Connor, 146 AD2d 909). "The desires of young children, capable of distortive manipulation by a bitter, or perhaps even well-meaning, parent, do not always reflect the long-term best interest of the children" (Matter of Nehra v Uhlar, 43 NY2d 242, 249; see Young v Young, 212 AD2d at 123).
In this case, although there is no doubt as to the child's custody and parental access preferences, the record does not support the conclusion that those preferences were the natural and expected result of the mother's conduct, or that they were otherwise motivated by legitimate, substantiated concerns (see Zoldan v Resnick, 134 AD2d 246, 247-248; cf. Pandis v Lapas, 176 AD3d 837, 840; Matter of Jillian EE. v Kane FF., 165 AD3d 1407, 1409-1410; Matter of Sanders v Jaco, 148 AD3d at 813-814; Matter of Sinnott-Turner v Kolba, 60 AD3d 774, 776). We emphasize again that the allegations of sexual assault, made by the father when the child was two and four years old, have been investigated and were determined to be unfounded. Indeed, despite years of allegations, investigations, and evaluations, there has never been "a specific finding that [the mother's] conduct will have a detrimental impact on the child" (Parker v Ford, 89 AD2d at 807; see Zoldan v Resnick, 134 AD2d at 247-248; Matter of Eric L. v Dorothy L., 130 AD2d at 660-661; Bubbins v Bubbins, 114 AD2d 346, 348; Janousek v Janousek, 108 AD2d at 784).
Rather, the record demonstrates that the child's view of her mother was the result of her father's negative influence. The child's relationship with her mother plainly deteriorated during the periods when she was in the father's custody, and the child has become strongly invested in pleasing solely her father. As the Family Court determined, the record is replete with examples of alienating behavior engaged in by the father (see Posporelis v Posporelis, 41 AD3d 986, 989-990). The record indicated that the father discussed these court proceedings with the child (see Matter of Virginia C. v Donald C., 114 AD3d 1032, 1035), and there is evidence that the child was actually instructed by her father to make false allegations against her older sister (see Posporelis v Posporelis, 41 AD3d at 986). The weight of the evidence established that the father's numerous unfounded allegations of sexual assault undermined the mother's attempts to form and maintain a relationship with the child (see Matter of Goldfarb v Szabo, 130 AD3d 728, 729; Anthony MM. v Jacquelyn NN., 91 AD3d 1036, 1037-1038; Matter of Sloand v Sloand, 30 AD3d 784, 785-786; Matter of Youngok Lim v Sangbom Lyi, 299 AD2d 763, 765-766; Matter of Turner v Turner, 260 AD2d 953, 954). Given the father's overt and public hostility towards the mother, "it would be surprising indeed if the [child was] eager after [her] enforced separation . . . to return to [her mother]" (Matter of Nehra v Uhlar, 43 NY2d at 248-249).
Under the circumstances, the expressed wishes of the child were, without more, insufficient to warrant the heavy restrictions imposed on the mother's parental access award (see Matter of Williams v Rolf, 144 AD3d 1409, 1414; Matter of Gerber v Gerber, 133 AD3d 1133, 1138-1139; Matter of Virginia C. v Donald C., 114 AD3d at 1035; Matter of Burola v Meek, 64 AD3d at 966; Young v Young, 212 AD2d at 123). The Family Court's decision to formally restrict the mother's legal right of access to supervised parental access with the child lacked a sound and substantial basis in the record. The record demonstrates that it is in the child's best interest to have liberal, unsupervised parental access with the mother.
The mother contends that the father's conduct in undermining her relationship with [*7]the child demonstrated that he is unfit to act as the custodial parent. The mother contends that the father's conduct was inconsistent with the best interests of the child, and that the Family Court should have awarded her physical custody of the child (see e.g. Zafran v Zafran, 306 AD2d 468, 469-470).
This Court has long recognized that "[a] custodial parent's interference with the relationship between a child and the noncustodial parent is deemed an act so inconsistent with the best interests of the children as to, per se, raise a strong probability that the offending party is unfit to act as custodial parent" (Matter of Lawlor v Eder, 106 AD3d 739, 740; see Matter of Williams v Rolf, 144 AD3d at 1413; Matter of Gerber v Gerber, 133 AD3d at 1138-1139; Matter of Goldfarb v Szabo, 130 AD3d at 729; Matter of Bennett v Schultz, 110 AD3d 792, 793; Matter of Purse v Crocker, 95 AD3d 1216, 1217; Bubbins v Bubbins, 114 AD2d 346, 348; Entwistle v Entwistle, 61 AD2d 380, 384-385).
However, a finding of parental interference or alienation "does not justify applying a per se rule requiring a change of custody, or even a rebuttable presumption that custody should be changed" (Matter of John A. v Bridget M., 16 AD3d 324, 335-336 [Saxe, J., concurring]; see Cervera v Bressler, 90 AD3d 803, 805-806; see also Domestic Relations Law § 240). "Rather, such a finding constitutes one fact, albeit an important one, in determining the best interests of the child[ ]" (Matter of John A. v Bridget M., 16 AD3d at 336 [Saxe, J., concurring]; see generally 2 New York Law of Domestic Violence § 4:14 [3d ed]).
In this case, the record supported the mother's contention that the father has been unable to place the needs of the child before his own need to express anger and hostility toward the mother, and that he is unable to foster a continuing relationship between the mother and the child (see Young v Young, 212 AD2d at 123). Although the father testified that he encouraged the child to have a relationship with the mother, as the Family Court concluded, his words and actions belied this testimony, and there was no evidence that the child suffered any real consequence as a result of her repeatedly disruptive and spiteful behavior (see Matter of Dobies v Brefka, 83 AD3d 1148, 1150). The record demonstrated that, over the years, the father has "failed to make progress in dealing with his continuing efforts to interfere with the child's relationship with [the mother]" (Posporelis v Posporelis, 41 AD3d at 990).
Furthermore, the evidence, including the expert testimony, demonstrated that the father's persistent behavior in holding the mother responsible for the unsubstantiated allegations of abuse has had a negative effect on the child's growth, development, and "overall well being" (Matter of Supangkat v Torres, 101 AD3d at 890; see Matter of Turner v Turner, 260 AD2d at 954). Evidence of the father's continuing denigration of the mother "leads to a conclusion that the [father] is unwilling or unable to abstain from this deleterious conduct" (Janecka v Franklin, 150 AD2d 755, 757). In all, "the past performance" of the father in his role as custodial parent weighed against his request for physical custody of the child moving forward (Matter of Supangkat v Torres, 101 AD3d at 890).
However, we agree with the Family Court that physical custody of the child should nevertheless remain with the father. This determination will best promote the child's stability, which is an important factor in determining the best interests of the child in this case (see Eschbach v Eschbach, 56 NY2d at 173; Friederwitzer v Friederwitzer, 55 NY2d at 94). The record, including the expert evidence, established that it would be traumatic for the child to have the stability of her home life disrupted after so many years by transferring custody to the mother while the child still deeply mistrusts her (see Cervera v Bressler, 90 AD3d at 805-806). Accordingly, we decline to disturb the Family Court's award of physical custody to the father.
"[G]iven the frequency with which accusations of sexual abuse crop up in the custody context, it is appropriate to consider the circumstances surrounding such an unsubstantiated claim, and to focus on what should follow" (John A. v Bridget M., 16 AD3d at 338-339 [Saxe, J. concurring]). Here, the record established that it is in the child's best interest to work toward a relationship with the mother that is built on trust and free from the stigma of past accusations. [*8]Accordingly, we direct the father to engage the child in weekly reunification therapy or other professional counseling with the goal of rebuilding the relationship between the mother and the child (see e.g. Thompson v Yu-Thompson, 41 AD3d 487, 488-489; Wolfson v Minerbo, 108 AD2d 682, 684). The Family Court is directed to "arrange and supervise" this therapy or counseling (Zoldan v Resnick, 134 AD2d at 248). Given the father's conduct in this case, we direct him to pay 100% of the expenses associated with such weekly reunification therapy or other professional counseling.
Contrary to the contention of the father, the award of joint legal custody to the parties was appropriate under the circumstances of this case (see Anonymous 2011-1 v Anonymous 2011-2, 136 AD3d 946, 949). Furthermore, "[i]n these circumstances, we think it appropriate to insist that there be a meaningful effort by both parties to participate in the [child's] counseling process so that a reasonable relationship can be reestablished between [mother] and child[ ]" (Wolfson v Minerbo, 108 AD2d at 684; see Matter of Sinnott-Turner v Kolba, 60 AD3d at 776). To this end, the parties are specifically prohibited from making derogatory or denigrating statements concerning each other in the child's presence or in the presence of "those who have contact with the child[ ]" (see Matter of Adams v Tersillo, 245 AD2d 446, 447).
As discussed more fully above, the weight of the evidence in this case demonstrated that the mother did not pose any risk to the physical or emotional well being of the child, and that it is in the child's best interest to have liberal, unsupervised parental access with the mother. The Family Court's decision to formally restrict the mother's legal right of access to supervised parental access with the child lacked a sound and substantial basis in the record. Accordingly, we modify the order appealed from so as to award the mother liberal, unsupervised parental access. We remit the mater to the Family Court, Westchester County, inter alia, "for a hearing to establish a more liberal [parental access] schedule" (Matter Brass v Otero, 40 AD3d 752, 753).
Given the present circumstances, we direct that the mother's award of liberal parental access may be exercised, in whole or in part, in the mother's sole discretion and without prejudice to her, in a supervised, therapeutic setting. We emphasize that any decision by the mother to voluntarily refrain from exercising the full scope of the liberal, unsupervised parental access awarded here will not, without more, serve to forfeit or abridge her legal right thereto (see Matter of Schack v Schack, 98 AD2d at 802; Strahl v Strahl, 66 AD2d 571, 577, affd 49 NY2d 1036). In light of the father's conduct, he is directed to pay 100% of the mother's parental access expenses, including travel expenses and expenses incurred in connection with any supervised, therapeutic parental access between the mother and the child.
DILLON, J.P., AUSTIN, MILLER and DUFFY, JJ., concur.
ENTER:
Aprilanne Agostino
Clerk of the Court